**In re FULGHUM CONSTRUCTION CORP., Debtor.**

**Robert H. WALDSCHMIDT, Trustee, Plaintiff–Appellee,**

**v.**

**Harry H. RANIER, Algin Nolan, and Ranier & Associates, Defendants–Appellants.**

No. 87–5532.

United States Court of Appeals, Sixth Circuit.

Argued April 29, 1988.

Decided April 14, 1989.

Tom H. Pierce (argued), Rouse, Rouse, Combs and Pierce, Robert L. Swisher, Versailles, Ky., for defendants-appellants.

Robert H. Waldschmidt (argued), Cosner and Waldschmidt, Nashville, Tenn., for plaintiff-appellee.

Before KRUPANSKY and BOGGS, Circuit Judges, LIVELY, Senior Circuit Judge.*

KRUPANSKY, Circuit Judge.

Defendants-appellants Harry H. Ranier (Ranier), Algin Nolan (Nolan), and their partnership Ranier & Associates (collectively, defendants) appealed from the district court's ruling affirming the bankruptcy court's determination that they were required to repay $197,432 plus prejudgment interest to the estate of the debtor Fulghum Construction Corporation (Fulghum or debtor) as an avoidable preferential transfer. The record disclosed the following facts.

Fulghum was a Texas corporation founded in 1966 with its principal place of business in Lavergne, Tennessee. It was engaged in the business of constructing oil and natural gas lines, and was owned and operated by James T. Fulghum and J.B. Miller. Through the first decade of its operation, Fulghum accumulated a substantial amount of construction equipment, but an operating loss of $600,000 in 1977 left the debtor without sufficient operating capital. Consequently, in October, 1977, James T. Fulghum and J.B. Miller sold all of the outstanding shares of stock in the corporation to Ranier and Neale R. Hall (Hall). James T. Fulghum continued to serve as president of the debtor, and Ranier and Hall were made vice presidents. Ranier and Hall agreed to infuse Fulghum with necessary operating capital to make it competitive in bidding for major construction projects.

In February, 1978, Ranier and Nolan formed a Kentucky general partnership, Ranier & Associates, which owned real estate and stock in various companies, operated an equipment leasing business and served as paid management, accounting and financial adviser primarily to companies in which it or the Ranier family had an investment interest. Ranier retained a 60% interest in Ranier & Associates, and Nolan owned the remaining 40% interest. In July, 1978, Hall sold his interest in Fulg-

---

* The Honorable Pierce Lively became Senior Circuit Judge January 1, 1989.

hum to Nolan, and all of its stock was then transferred by Ranier and Nolan to Ranier & Associates which then became the sole owner of Fulghum stock. On July 15, 1978, James T. Fulghum and J.B. Miller were discharged after it was discovered that they had misappropriated approximately $194,000 of the debtor's funds.

After James T. Fulghum and J.B. Miller were discharged, Ranier & Associates undertook a restructuring of Fulghum. Nolan was placed in charge of Fulghum's financial affairs. Ranier & Associates provided accounting and management services for Fulghum and it opened an office in space rented from Ranier & Associates. Additionally, Fulghum elected a new board of directors under whose direction James Gray (Gray), Roland Tucker (Tucker), and Michael Leatherman (Leatherman) assumed the operation of Fulghum. Neither Ranier & Associates, Nolan, or Ranier were active in the day to day operation of Fulghum.

It is undisputed that Fulghum and Ranier & Associates remained separate corporate entities and any control Ranier & Associates exercised over Fulghum was in good faith. On September 20, 1978, in an effort to improve Fulghum's liquidity to permit it to become more competitive in its bidding practices, Ranier & Associates agreed, in writing, to purchase Fulghum's heavy equipment for its fair market value of $1,137,350 in cash, and in a second written agreement to lease the equipment back to the construction company.

The sale/leaseback arrangement at least temporarily improved Fulghum's financial position. Fulghum thereafter was the successful bidder on four major pipeline construction projects. Subsequent to commencing its performance of the contracts, it experienced short-term cash flow difficulties prompted by delinquent payments from the pipeline companies for which it was performing services. To meet current expenses, particularly payroll, Ranier & Associates advanced cash to Fulghum to meet its immediate cash flow demands. Nolan testified that the cash advances were conditioned upon Fulghum's timely repayment upon Fulghum's receipt of checks from the pipeline companies. During the last year of the debtor's operation, i.e., from November, 1978 to November 1979, Ranier & Associates made over 100 such arms-length short-term advances to Fulghum. During this period, Ranier & Associates experienced a shortfall of $430,000 in repayments. Additionally, Fulghum had, by the date of its bankruptcy, accrued an indebtedness to Ranier & Associates for an additional $209,000 as equipment rental and accounting fees.

Because of these advances from Ranier & Associates, Fulghum was capable of completing its four construction contracts. Gray and Tucker had assured Ranier & Associates and Nolan that the four projects would yield a substantial net profit.[1]

However, in November 1979, Gray admitted to Nolan that Fulghum had accrued liabilities approximating $605,000 apart from the amounts that were due and owing to Ranier & Associates. Nolan also learned that the company would likely sustain a substantial withholding tax assessment liability. As a result of its financial indebtedness, Fulghum ceased operation in November, 1979. Shortly thereafter, on January 25, 1980, an involuntary bankruptcy petition was filed against Fulghum in the United States Bankruptcy Court for the Middle District of Tennessee.

On February 6, 1980, the debtor's trustee in bankruptcy (trustee), initiated the instant adversary action against Ranier, Nolan, and Ranier & Associates to set aside the equipment sale/lease back agreements and to recover as preferential transfers all payments Fulghum made to Ranier & Associates within one year prior to the filing of the bankruptcy petition.[2] On July 14,

---

**1.** The precise amount of the estimated profit was unclear. Nolan testified that the first two jobs were predicted to result in "a couple of hundred thousand dollars" and "maybe two hundred thousand dollars on the other two, profit."

**2.** 11 U.S.C. § 547 permits the trustee to avoid preferential transfers made within 90 days prior

1980, the bankruptcy court refused to set aside the sale of Fulghum's equipment to Ranier & Associates. On November 28, 1980, the bankruptcy court ruled that the transfers of cash from the debtor to Ranier & Associates, i.e., the repayment of short-term cash advances, were not preferential under the "net result rule" because in the year prior to bankruptcy Ranier & Associates had transferred more money to Fulghum in the form of short-term cash advances than Fulghum repaid to Ranier & Associates. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 7 B.R. 629 (Bankr.M.D.Tenn.1980).[3] The district court affirmed, *In re Fulghum Constr. Corp.*, 14 B.R. 293 (M.D.Tenn.1981), and the defendants appealed to this court.

On May 9, 1983, this court affirmed the lower court's determination that the trustee could not set aside the equipment sale, but vacated and remanded that part of the judgment in which the lower courts determined that the repayments to Ranier & Associates could not be avoided as preferential transfers. This court concluded that the "net result rule" was not authorized under the Bankruptcy Code and vacated that part of the district court's order and remanded the case with instructions to identify which, if any, of the repayments from the debtor to Ranier & Associates were preferential under the Bankruptcy Code. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 706 F.2d 171 (6th Cir.), *cert. denied*, 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983).

On remand, the bankruptcy court determined that most of the payments were not preferential under § 547(c)(4)[4] because Ranier and Associates had given "new value"

to Fulghum in the form of advances subsequent to most of the repayments. The court determined, however, that a final November 30, 1979 repayment from Fulghum to Ranier & Associates in the amount of $300,000, was preferential, subject to subsequent "new value" setoffs of $102,568. Accordingly, the court ruled that the trustee was entitled to recover $197,432.00. *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.*, 45 B.R. 112 (Bankr.M.D. Tenn.1984)). The district court affirmed, *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 78 B.R. 146 (M.D. Tenn. 1987), and defendants thereafter commenced this timely appeal.

"Fact findings of the bankruptcy court are reviewed for clear error. But, where the bankruptcy court's fact finding arises from a misunderstanding of the law, it is reviewed for plain error of law." *Morgan v. K.C. Machine & Tool Co.*, 816 F.2d 238, 244 (6th Cir.1987) (citations omitted).

On appeal, the defendants asserted, *inter alia*, that the district court and bankruptcy court erred by concluding that the final repayment here in controversy was not a transfer in payment of debt incurred in the ordinary course of the debtor's business and therefore not an avoidable preferential transfer under 11 U.S.C. § 547(c)(2).

Pertinent to the issue confronting this court is 11 U.S.C. § 547(c)(2), which reads as follows:

(C) The trustee may not avoid under this section a transfer—

    \*    \*    \*    \*    \*    \*

(2) to the extent that such transfer was—

---

to the filing of the bankruptcy petition, but permits him to avoid preferential transfers made within one year prior to the filing of the petition if the creditor to whom the transfer was made was an "insider," 11 U.S.C. § 547(b)(4)(B). Ranier & Associates did not contest the fact that it was classified as an insider for the purposes of 11 U.S.C. § 547.

**3.** The record disclosed that in the year prior to bankruptcy, Ranier & Associates advanced Fulghum approximately $430,000 more than was repaid in that same period.

**4.** 11 U.S.C. § 547(c)(4) provides:

(c) The trustee may not avoid under this section a transfer—

    \*    \*    \*    \*    \*    \*

(4) to or for the benefit of a creditor, to the extent that, after such a transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

The Bankruptcy Code does not define "ordinary course of business" or "ordinary business terms." Moreover, the legislative history of the provision is notably "sparse." *See, WJM, Inc. v. Mass. Dept. of Pub. Welfare,* 840 F.2d 996, 1010 (1st Cir. 1988). However, subsequent case law is in agreement that this section was intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee." *In re Energy Co–Op Inc.,* 832 F.2d 997, 1004 (7th Cir.1987). Congress enacted § 547(c)(2) "to leave undisturbed normal financial relations, because they do not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy." *In re Advance Glove Mfg. Co.,* 761 F.2d 249, 251 (6th Cir.1985) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5874).

■ Despite the foregoing standards, there is no precise legal test which can be applied; rather, this court must engage in a "peculiarly factual" analysis. *In re First Software Corp.,* 81 B.R. 211, 213 (Bankr.D. Mass.1988). *See also In re Craig Oil Co.,* 785 F.2d 1563, 1565 (11th Cir.1986) (applicability of § 547(c)(2) turns on the specific events surrounding debtor's payments to defendant). The focus of this court's inquiry must be directed to an analysis of the

business practices which were unique to the particular parties under consideration and not to the practices which generally prevailed in the industry of the parties. *See WJM, Inc. v. Massachusetts Dept. of Pub. Welfare,* 840 F.2d 996, 1011 (1st Cir. 1988) ("the cornerstone of this element of a preference defense is that the creditor needs demonstrate some consistency with other business transactions *between the debtor and the creditor*") (quoting *In re Magic Circle Energy Corp.* 64 B.R. 269, 273 (Bankr.W.D.Okla.1986)) (emphasis added). Even if the debtor's business transactions were irregular, they may be considered "ordinary" for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties. *In re White,* 58 B.R. 266, 270 (Bankr.E.D.Tenn.1986) (payments by debtor were "ordinary" even if they were made on irregular basis and debtor was allowed to maintain a significant amount owing to creditor at all times). *See also In re Craig Oil Co.,* 785 F.2d 1563, 1566–67 (11th Cir.1986) (examining past terms of business between the parties to determine if payments were made according to ordinary business terms).[5]

■ In the case at bar, it is undisputed that the "ordinary business" of Ranier & Associates was to serve as a financial adviser to construction companies in which the Ranier family had a stock interest. Indeed, Nolan testified, without contradiction, that it was common for Ranier & Associates to advance short-term advances to those companies. Nolan testified:

NOLAN: Yes, sir. It had to be, because these were cash funds that I got out of Ranier & Associates' bank account, sometimes out of Mr. Ranier's bank account. Sometimes I would contact other companies and ask if they had

---

**5.** Consideration of the practices of the parties might not conclude the § 547(c)(2) analysis; industry practice might be relevant to the § 547(c)(2)(C) element of "ordinary business terms." *E.g. In re Magic Circle,* 64 Bankr. 269, 274 (Bankr.W.D.Okla.1986). However, in the instant case, this court is constrained to consider only the practices of the parties. The trustee did not dispute the appellants' contention that

"'ordinary' contemplates what is ordinary with respect to the parties." Appellants' Brief at 29. Nor is there any record evidence to indicate that industry practice differs from those of the parties, and, indeed, the record discloses that short-term financing to enable construction companies to meet cash flow needs is a common practice.

some surplus funds that I could use, say, for ten days.

Q. In those cases, they would send the funds through Ranier & Associates?

NOLAN: They would send the funds to Ranier & Associates. The reason they would do this is because when they— all these were construction companies, mostly—and *when they needed money, they called on Ranier & Associates, also. And I would help them out when I could. That was part of my functions as the managing partner of Ranier & Associates.*

Accordingly, Ranier & Associates served as a short-term lender, providing good faith advances to alleviate cash flow difficulties of corporations in which it had a stock interest. The function of Ranier & Associates was akin to that performed by lending institutions which provide advances to cover overdrafts of their customers when those customers experienced cash flow shortages. In such cases, it is well-settled that overdraft protection is a transaction within the ordinary course of business pursuant to § 547(c)(2). *See e.g. Schmidt v. First Nat'l Bank Pipestone, Minn. (In re Schmidt)*, 26 B.R. 89, 91 (Bankr.D.Minn. 1982) (bank's coverage of debtor's overdrafts was made in the ordinary course of business); *In re Ia. Premium Service Co., Inc.*, 695 F.2d 1109, 1110 (8th Cir.1982) (stipulating that bank overdraft coverage was within ordinary course of business).

Additionally, the number and short-term duration of the advances and prompt repayments required of Fulghum militate in favor of a finding that the $300,000 in question was advanced in the ordinary course of business and pursuant to the ordinary terms of the parties' business. The advances and repayments were "recurring" in nature as demonstrated by over 100 such transactions which were executed between November, 1978 and November, 1979. *See e.g. WJM*, 840 F.2d at 1011 (there is a consensus that "ordinary course of business" encompasses recurring, customary

credit transactions). *See also In re Magic Circle Energy Corp.*, 64 B.R. 269, 274 (Bankr.W.D.Okla.1986) (transfers by Chap. 11 debtor to creditor were in ordinary course of business where debtor had been making transfers for over a year). Correspondingly, it was apparent that the controversial $300,000 repayment did not result from "unusual debt collection or payment practices," but was simply one of many repayments to Ranier & Associates from Fulghum. *See In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir.1985) (purpose of the section is to protect those payments which do not result from "unusual" debt collection or payment practices). *See also In re Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986) (when debtor's business regularly involved borrowing large sums of money, such loans were in ordinary course of business; even loans made on the eve of bankruptcy to relieve a debtor's cash flow problems may be considered "ordinary"), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1954, 95 L.Ed.2d 526 (1987). The advances were not unusual but mandated by Fulghum's business, i.e., by the slow payment practices of the pipeline companies with which it had contracted. Accordingly, the advances were not only ordinary transactions between the parties but were necessary and without which Fulghum could not have accommodated its immediate cash flow requirements.

This court declines to discourage transactions of the type here at issue, which were a paradigmatic example of the type of transaction promoted by § 547(c). The primary purpose of that section was to encourage "short term credit dealing[s] with troubled debtors in order to forestall bankruptcy." *See In re First Software Corp.*, 81 B.R. at 213. *See also O'Neill v. Nestle Libby's P.R., Inc.*, 729 F.2d 35, 37 (1st Cir.1984) (§ 547(c)(2) exception is designed to encourage creditors to conduct business with a struggling enterprise so that debtors can rehabilitate themselves).[6] In the case at bar, Ranier & Associates advanced funds under the good faith belief that Fulg-

---

6. *See also In re Southern Indus. Banking Corp.*, 92 B.R. 297 (E.D.Tenn.1988) (§ 547(c)(2) is designed to discourage creditors from cutting off

financially troubled debtors at a time when creditor cooperation is most needed).

hum would complete and substantially profit from the four pipeline projects. Indeed, the repayments did not injure the rights of other creditors because the initial advances were made so that those creditors could be paid while Fulghum awaited the receipt of monies for work performed on construction projects. *Cf. In re Magic Circle,* 64 B.R. at 274 (where alleged preferences benefited both creditor and debtor, they were not avoidable).

There is no allegation that the repayment to Ranier & Associates was in bad faith. *See In re Craig Oil,* 785 F.2d at 1565 (debtor's state of mind is relevant to determining if § 547(c)(2) exception is available). The repayment here in controversy was made nearly two full months before the petition for bankruptcy was filed. As in *Colonial Discount Corp.,* 807 F.2d at 600, "nothing in the record suggests that [the repayment] was related in any way to prebankruptcy planning." On the contrary, the record unequivocally disclosed that the advances and repayments were recurring, customary, and designed to keep Fulghum in business.

Accordingly, the repayment of $300,000 in question satisfied the standards for the § 547(c)(2) exception to the preference section. The repayment was within the ordinary course of business and pursuant to the ordinary business terms of the debtor and creditor. Accordingly, the judgment of the district court is REVERSED and REMANDED to that court for entry of judgment consistent with this opinion.[7]

---

7. Because of this court's resolution of this issue, it does not address defendant's argument that the payments were exempt from avoidance under § 547(c)(1) and its assignment of error concerning the bankruptcy court's award of prejudgment interest.