**In re YURIKA FOODS CORP., Debtor and Debtor–in–Possession.**

**YURIKA FOODS CORPORATION, Plaintiff–Appellee,**

v.

**UNITED PARCEL SERVICE, Defendant–Appellant.**

**No. 88–1692.**

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1989.

Decided Oct. 23, 1989.

Todd M. Halbert, John G. Colucci (argued), Asher Rabinowitz, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for Yurika Foods Corp.

James M. Wienner, Butzel, Long, Gust, Klein & Van Zile, Birmingham, Mich., Irving R. Segal (argued), David G. Battis, Carl A. Solano, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for United Parcel Service.

Before JONES, WELLFORD and GUY, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendant, United Parcel Service ("UPS"), appeals the judgment of the district court, which decided for plaintiff Yurika Foods Corporation ("Yurika"). For the following reasons, we reverse.

## I.

Yurika is engaged in the distribution, marketing and selling of food products. UPS is a common carrier of freight regulated by the Interstate Commerce Commission ("ICC"). Since its inception in 1982, Yurika used UPS and other carriers to distribute its products. Until December 1984, UPS experienced no problems with the Yurika account. However, in December 1984, Yurika suffered major financial difficulties and severe cash flow shortages. As a result of Yurika's financial problems, the company fell behind on its payments.

UPS tariffs, drafted in light of ICC regulations, extend credit to shippers for seven days (excluding Saturdays, Sundays, and legal holidays) after mailing of a bill by UPS. Credit is important to shippers because it allows them to receive uninterrupted service from UPS without paying for every shipment independently. In light of Yurika's late payments, UPS obtained two deposits from Yurika in early 1985. Despite receipt of the deposits, during the early months of 1985 UPS suspended credit to Yurika's accounts on several occasions when Yurika failed to pay its bills. Credit was restored when Yurika made payments.

On August 9, 1985, Yurika filed a voluntary petition in bankruptcy under Chapter 11 in the United States Bankuptcy Court for the Eastern District of Michigan. The 90–day preference period preceding Yurika's voluntary petition in bankruptcy ran from May 11 through August 8, 1985. During this period, Yurika made eighteen payments to UPS. These payments were in response to 59 bills dispatched to Yurika from February 2 through July 20, 1985, plus $1,211.02 not related to a specific bill. The aggregate amount of the eighteen payments was $82,458.85. However, the parties have stipulated that the amount at issue is $40,000.00.

On July 22, 1986, Yurika initiated an adversary proceeding in the United States Bankruptcy Court for the Eastern District of Michigan, seeking return of the eighteen payments it made to UPS within the ninety days before it filed its voluntary petition in bankruptcy under Chapter 11. On December 17, 1987, the bankruptcy court decided that Yurika was entitled to a return of the payments from UPS. On January 27, 1988, UPS filed an appeal to the district court, which affirmed and adopted the bankruptcy court's opinion on June 14, 1988.

## II.

On appeal, UPS claims that section 547 of the Bankruptcy Code does not require it to return Yurika's payments. Specifically, UPS attacks the district court's ruling, which stated that because UPS credit terms violated ICC regulations, transfers during the preference period could not as a matter of law be within the "ordinary course of business" exception.

Under section 547, preferential transfers made in the 90 days preceding the petition

for bankruptcy may be avoided and returned to the transferor. Section 547(c)(2) contains an exception for debts incurred in the ordinary course of business between the debtor and creditor. Normally, if late payments were the standard course of dealing between the parties, they shall be considered as within the ordinary course of business under section 547(c)(2). *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir.1989). Despite the fact that Yurika ordinarily did make late payments to UPS, the district court in the instant case held that late payments to motor carriers like UPS can never be made in the ordinary course of business because the payment due dates for carriers were "made mandatory by the [ICC] statute and regulations and the parties were not free to alter those terms." J.App. at 15–16.

The district court specifically found that Yurika's payments to UPS were illegal because they violated ICC regulations. As a common carrier, UPS is subject to regulation by the ICC, pursuant to 49 U.S.C. § 10101, *et seq.* (1982). UPS may extend credit only in accordance with 49 U.S.C. § 10743, which authorizes the ICC to promulgate regulations. The applicable regulations at 49 C.F.R. 1320.2 provide in pertinent part that:

> (b) *When the credit period begins.* The credit period shall begin on the day following presentation of the freight bill.

> (c) *Length of credit period.* Unless a different credit period has been established by the tariff publication pursuant to paragraph (d) of this section, the credit period is 15 days. It includes Saturdays, Sundays, and legal holidays.

> (d) *Carriers may establish different credit periods in tariff rules.* Carriers may publish tariff rules establishing credit periods different from those in paragraph (c) of this section. Such credit periods shall not be longer than 30 calendar days.

The court determined that it was unlawful for UPS to collect amounts due on bills that were outstanding for more than seven days (the time stated in the UPS Tariffs) or 15/30 days (the time stated in the ICC regulations).

UPS contends that the payments were not unlawful and relies on *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982). In *Southern Pacific,* the Supreme Court held that a carrier's violation of ICC credit regulations does not provide an affirmative defense to shippers. Furthermore, the *Southern Pacific* Court stated that even if collections are made beyond the time specified in the ICC regulations, "a carrier has not only the right but also the duty to recover its proper charges for services performed." *Id.* at 343, 102 S.Ct. at 1821. After canvassing the statutes and ICC regulations governing extensions of credit by carriers, the Court concluded that allowing a shipper to rely on the regulations as a defense to collection would be contrary to public policy because the "consequence would be to discourage [carriers] from extending credit where the operation of this rather difficult statute is in doubt." *Id.* at 349, 102 S.Ct. at 1823 (citation omitted). Because the *Southern Pacific* Court did not consider such late collections illegal, we find that UPS' collection of late payments for freight charges is not unauthorized or unlawful under the ICC regulating scheme, and as such is not per se outside of the ordinary course of business exception.

### III.

Having concluded that the payments were not illegal, we must still determine whether or not the transfers are avoidable under section 547(c)(2) of the Bankruptcy Code. UPS contends that Yurika's payments fit within the ordinary course of business exception of section 547(c)(2), under which the trustee in bankruptcy cannot avoid a transfer to the extent such transfer was

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (1982).

 Whether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination which should not be set aside unless clearly erroneous. *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir. 1989). The *Fulghum* court determined that section 547(c)(2) was intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee." *Id.* at 743 (citation omitted). Because there is no readily applicable test of what constitutes an "ordinary course of business," this court must engage in a factual analysis of "the business practices which were unique to the particular parties under consideration . . ." *Id.*

 In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made. *In re White*, 58 B.R. 266 (Bankr.E.D.Tenn.1986). Thus, "[e]ven if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Fulghum*, 872 F.2d at 743 (citing *In re White*, 58 B.R. at 270). The *Fulghum* court did acknowledge that courts "might" be required to examine the industry standards in addition to the parties' prior dealings. *Id.* at 743, n. 2. Although there was no need to examine industry practices in *Fulghum*, in the instant case, industry practices are directly implicated.

 Although the courts below did rely on an improper legal standard to determine that the payments were outside the ordinary course of business as a matter of law, the courts did examine the facts involved in this case. The bankruptcy court determined that late payments were the ordinary practice between the debtor (Yurika) and the creditor (UPS). The court indicated that 87% of Yurika's payments were made after the period specified in the bills,

and more than half after twice the period of seven days specified. The district court affirmed the decision of the bankruptcy court, noting the bankruptcy court's finding that the late "payments were made in the ordinary course of business between the parties." J.App. at 9.

We conclude that substantial evidence supports the lower courts' finding that late payments were the ordinary course of dealing between the parties. In addition, our examination of the facts indicates that for many years, 82% of carriers in the industry had not followed the credit limitation set out in the regulation and invoice terms. Thus, since the payments were in the ordinary course of business, they were not avoidable by the trustee.

### IV.

For the foregoing reasons, we REVERSE the decisions of the bankruptcy court and the district court to the extent that they held that the ICC statute and regulations compel a per se conclusion that late payment for freight charges must be considered outside the usual and ordinary course of business. We REMAND for entry of a judgment consistent with our affirmance of the factual finding that the late payments at issue constituted the ordinary practice between the parties.