902 F.2d 33
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re INDUSTRIAL METAL FABRICATORS, a Michigan Corporation, Debtor.
MICHIGAN CONSOLIDATED GAS COMPANY, Appellant,
v.
Sheila J. SOLOMON, Trustee for Industrial Metal Fabricators,
a Michigan Corporation, Appellee.
 No. 89-1814.
 United States Court of Appeals, Sixth Circuit.
 May 2, 1990.
 
 Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Michigan Consolidated Gas Company appeals from the district court's order affirming the bankruptcy court's award of $4,426.43 to Solomon (Industrial Metal Fabricators' bankruptcy trustee) as a recoverable preferential transfer.
 
 I.
 
 2
 Industrial Metal Fabricators (Industrial) was a business engaged in the fabrication of heavy steel plate. Industrial heated its building with natural gas purchased from the appellant, Michigan Consolidated Gas Company (MichCon). Due to financial difficulties, Industrial fell behind in its payments to MichCon in early 1986. After initially accepting the delayed payments, MichCon contacted Industrial in April, 1986, regarding Industrial's overdue account. MichCon advised Industrial that its gas supply would be terminated if Industrial did not arrange to pay the arrearage.
 
 
 3
 Industrial and MichCon subsequently negotiated a payment agreement allowing Industrial to pay the arrearage. Pursuant to the terms of the agreement, Industrial was to pay MichCon $7,058.02 immediately, and $2,500.00 per month for the next four months. MichCon thereupon sent Industrial a payment agreement on April 24, 1986. Industrial, however, never signed the agreement, never tendered the initial payment, and defaulted on the entire agreement. Though Industrial and MichCon contacted each other at various times thereafter to negotiate payment, no payments resulted. On June 9, 1986, MichCon sent Industrial a notice stating that its gas service would be terminated if payment arrangements were not immediately negotiated. This notice resulted in further negotiations between the two parties.
 
 
 4
 Industrial owed MichCon $19,743.65 in arrearage on June 16, 1986. The following negotiated payments were thereafter tendered by Industrial to MichCon:
 
 
 5
 June 30, 1986 $12,058.02
July 23, 1986 $ 969.06
September 4, 1986 $ 930.30
September 19, 1986 $ 2,500.00
October 16, 1986 $ 1,926.43
 
 
 6
 On November 21, 1986, Industrial filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. On or about December 30, 1986, Industrial consented to convert to Chapter 7 of the Bankruptcy Code. On May 4, 1987, the appellee, Sheila J. Solomon, was appointed trustee.
 
 
 7
 On July 29, 1988, Solomon filed an adversary action seeking to avoid as preferential the September 19 and October 16 transfers to MichCon totaling $4,426.43. MichCon, however, argued that the payments were made in the ordinary course of business pursuant to 11 U.S.C. Sec. 547(c)(2) (1989) and were, therefore, not recoverable.
 
 
 8
 Trial was held in the United States Bankruptcy Court for the Eastern District of Michigan on January 26, 1989. The court, after hearing arguments and testimony from both parties, determined that Industrial's payments to MichCon were voidable preferences and, therefore, awarded $4,426.43 to Solomon.
 
 
 9
 MichCon appealed the bankruptcy court's decision to the United States District Court for the Eastern District of Michigan. The district court analyzed the collection practices of MichCon, including its use of shut-off notices, and determined that Industrial's two payments to MichCon were not made "in the ordinary course of business or financial affairs of the debtor and the transferee" pursuant to 11 U.S.C. Sec. 547(c)(2)(B) (1989). The district court therefore affirmed the bankruptcy court's decision.
 
 
 10
 MichCon timely filed a notice of appeal.
 
 II.
 
 11
 Whether a payment is made in the ordinary course of business, and made according to ordinary business terms, is a factual determination which should not be set aside unless clearly erroneous. In re Yurika Foods Corp., 888 F.2d 42, 45 (6th Cir.1989).
 
 
 12
 Section 547 of the Bankruptcy Code provides that preferential transfers made in the 90 days preceding the petition for bankruptcy may be avoided, and returned to the transferor. Solomon successfully invoked the authority of 11 U.S.C. Sec. 547(b) to recover the two preferential utility payments made by Industrial to MichCon. 11 U.S.C. Sec. 547(b) (1989) provides:
 
 
 13
 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
 
 
 14
 (1) to or for the benefit of the creditor;
 
 
 15
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 
 
 16
 (3) made while the debtor was insolvent;
 
 
 17
 (4) made--
 
 
 18
 (A) on or within 90 days before the date of the filing of the petition; or
 
 
 19
 (B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and
 
 
 20
 (5) that enables such creditor to receive more than such creditor would receive if--
 
 
 21
 (A) the case were a case under chapter 7 of this title;
 
 
 22
 (B) the transfer had not been made; and
 
 
 23
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 24
 Id.
 
 
 25
 Section 547(c)(2), however, contains an exception for debts incurred in the ordinary course of the debtor's and creditor's business. MichCon argues on appeal that the September 19 and October 16 payments were made in the ordinary course of the debtor's and creditor's business and were, therefore, immune from the appellee's avoidance powers. 11 U.S.C. Sec. 547(c)(2) (1989) provides:
 
 
 26
 (c) The trustee may not avoid under this section a transfer--
 
 
 27
 (2) to the extent that such transfer was--
 
 
 28
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 
 
 29
 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 
 
 30
 (C) made according to ordinary business terms.
 
 
 31
 Id.
 
 
 32
 The Bankruptcy Code does not define "ordinary course of business' or "ordinary business terms." Furthermore, the legislative history of the provision is notably "sparse." See WJM, Inc. v. Massachusetts Dep't of Pub. Welfare, 840 F.2d 996, 1010 (1st Cir.1988). This court, however, has previously held that section 547(c)(2) was intended to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee." In re Fulghum Constr. Corp., 872 F.2d 739, 743 (6th Cir.1989) (citation omitted). "Because there is no readily applicable test of what constitutes an 'ordinary course of business,' this court must engage in a factual analysis of 'the business practices which were unique to the particular parties under consideration....' " In re Yurika Foods Corp., 888 F.2d at 45 (quoting In re Fulghum Constr. Corp., 872 F.2d at 743). Congress enacted Sec. 547(c)(2) "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." Matter of Advance Glove Mfg. Co., 761 F.2d 249, 251 (6th Cir.1985) (citations omitted).
 
 
 33
 When considering which transactions are ordinary, courts should examine several factors including the transaction's timing and amount, the manner in which the transaction was paid, and the circumstances under which the transfer was made. In re Yurika Foods Corp., 888 F.2d at 45 (citing In re White, 58 B.R. 266 (Bankr.E.D.Tenn. Feb. 7, 1986)). Therefore, even if the debtor's business transactions were irregular, they may nevertheless be considered "ordinary" for purposes of Sec. 547(c)(2) if those transactions were consistent with the prior course of dealings between the parties. In re Fulghum Constr. Corp., 872 F.2d at 743.
 
 
 34
 Because the applicability of Sec. 547(c)(2) depends on the specific events surrounding a debtor's payments to a creditor, a court must engage in a "peculiarly factual" analysis. In re First Software Corp., 81 B.R. 211, 213 (Bankr.D.Mass. Jan. 8, 1988); see also In re Craig Oil Co., 785 F.2d 1563, 1565 (11th Cir.1986). The focus of this court's inquiry in the instant action must, therefore, be directed to an analysis of the business practices which were unique to Industrial and MichCon, and not to the practices which generally prevailed throughout the utility industry. See In re Fulghum Constr. Corp., 872 F.2d at 743. "[T]he cornerstone of this element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between the debtor and the creditor." WJM, Inc. v. Massachusetts Dep't of Pub. Welfare, 840 F.2d at 1011 (quoting In re Magic Circle Energy Corp., 64 B.R. 269, 273 (Bankr.W.D.Okla. Aug. 19, 1986)).
 
 
 35
 Significantly applicable to the instant action is the Eleventh Circuit's reasoning in In re Craig Oil Co., 785 F.2d 1563 (11th Cir.1986):
 
 
 36
 Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception. As several courts have noted, this exception is directed primarily to ordinary trade credit transactions. These typically involve some extension of credit but are meant to be paid in full within a single billing cycle. Because the credit extended is meant to be extremely short-term, Congress likened payment of trade credit to payment of current expenses. Recognizing that the latter had traditionally been protected from avoidance in bankruptcy, Congress extended the same protection to trade credit through the ordinary course of business provision. Since the foundation of this provision is the similarity of trade credit and current expenses, the scope of its protection is necessarily limited to trade credit which is "kept current" or other transactions which are paid in full within the initial billing cycle. Thus, untimely payments are more likely to be considered outside the ordinary course of business and avoidable as preferences.
 
 
 37
 Id. at 1567-68 (citations omitted) (footnotes omitted). See also Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc., 819 F.2d 214, 216 (9th Cir.1987) (although "ordinary course of business" is not expressly defined in the Bankruptcy Code, it appears that the purpose of Section 547(c)(2) is to protect from preference ordinary trade credit transactions, including payment of monthly utility bills, that are kept current ); Matter of Gold Coast Seed Co., 24 B.R. 595, 597 (Bankr. 9th Cir. Sept. 30, 1982) (untimeliness "in particular" placed the payment outside the ordinary course of business "as a matter of law"); In re Ewald Bros., Inc., 45 B.R. 52, 59 (Bankr.D.Minn. Oct. 26, 1984) (overdue payments are not in the ordinary course of business). But see In re Mindy's, Inc., 17 B.R. 177 (Bankr.S.D.Ohio Jan. 11, 1982) (late rental payments were made in the ordinary course of business because they were, in fact, timely in view of the parties' prior dealings).
 
 
 38
 MichCon's characterization of the September 19 and October 16 payments as being in the ordinary course of the parties' businesses must fail because the evidence supports the lower courts' findings that the payments were not made in the ordinary course of the debtor's business as required by 11 U.S.C. Sec. 547(c)(2)(B) (1989). Though settlement agreements and shut-off notices may be normal aspects of MichCon's business, nothing in the record indicates these practices were customary between MichCon and Industrial. When Industrial fell behind in its payments to MichCon in "early 1986," MichCon initially accepted the delayed payments from Industrial thereby, arguably, waiving its future right to contest untimely payments. After establishing the precedent of accepting late payments, MichCon failed to contact Industrial to arrange arrearage payments until Industrial's financial condition had significantly deteriorated. Furthermore, MichCon's shut-off notice left Industrial with few options if it wished to continue operating.
 
 
 39
 The prior course of dealing between Industrial and MichCon clearly supports Industrial's position that the settlement agreements and shut-off notices were not within MichCon's "ordinary course of business' with respect to Industrial. Determination of what has been the ordinary course of conduct between a debtor and a creditor, for purposes of determining whether the transfer will be avoided as preferential, will require that a court look at factors such as the length of time that the parties have engaged in the type of dealing at issue, whether the transfer was abnormally large, whether the creditor engaged in any unusual action to collect the debt, and whether the transferee did anything to gain an advantage in light of the debtor's deteriorating financial condition. In re Richardson, 94 B.R. 56 (Bankr.E.D.Pa. Nov. 21, 1988). In the instant action, the parties' prior dealings, coupled with the coercive nature of a utility company's shut-off notice, support the finding that MichCon's collection efforts were not within the parties' "ordinary course of business," and, therefore, not exempt from the appellee's avoidance authority. MichCon's unusual collection efforts benefited MichCon to the detriment of Industrial's other creditors.
 
 
 40
 Because the bankruptcy court's finding--that MichCon's actions were outside of the normal course of business practices previously maintained between MichCon and Industrial--is not clearly erroneous, the trustee is not barred from avoiding the $4,426.43 preferential payments made by Industrial to MichCon. The district court's decision is, therefore, AFFIRMED.
 
 
 41
 KEITH, Circuit Judge, dissenting.
 
 
 42
 I respectfully dissent. The majority suggests that in determining the applicability of Sec. 547(c)(2) to the present case, this court should focus on "an analysis of the business practices which were unique to Industrial and MichCon, and not to the practices which generally prevailed throughout the utility industry." Majority Opinion at 7 (citing In re Fulghum Constr. Corp., 872 F.2d 739, 743 (6th Cir.1989)).
 
 
 43
 While I agree with the majority's reliance upon Fulghum in the present case, my reading of Fulghum differs from that of the majority. In Fulghum, the bankruptcy trustee initiated an action to recover, as preferential transfers, all payments made to the creditor within one year prior to the debtor's filing of the bankruptcy petition. See 872 F.2d at 741. In reviewing the creditor's appeal from the adverse judgments of the bankruptcy and district courts, this court held: first, that the creditor regularly provided good-faith, short-term advances to alleviate the cash flow difficulties inherent in the debtor's business of constructing oil and natural gas lines; and second, that the debtor's repayment of those short-term advances, during the preference period, was within the ordinary course of business between the parties, and thus, was not an avoidable preferential transfer. See id. at 744.
 
 
 44
 After focusing on the specific business practices of the debtor and creditor in Fulghum, this court suggested that, in other cases, it might be appropriate to consider both the business practices unique to the parties and the business practices which generally prevail in the industry:
 
 
 45
 Consideration of the practices of the parties might not conclude the Sec. 547(c) analysis; industry practice might be relevant to the Sec. 547(c)(2)(C) element of "ordinary business terms." E.g. In re Magic Circle, 64 Bankr. 269, 274 (Bankr.W.D.Okla.1986).
 
 
 46
 Fulghum, 872 F.2d at 743 n. 5.
 
 
 47
 From my perspective, a Sec. 547(c)(2) analysis of the present case requires consideration of industry practice unique to public utilities. Although public utilities were not referenced in Sec. 547(c)(2), the Bankruptcy Code does recognize the unique status of public utilities in Sec. 366. Compare 11 U.S.C. Sec. 547 with 11 U.S.C. Sec. 366. In Sec. 366(a), a debtor, who has filed for bankruptcy, is protected from a cutoff in the monopoly services of a public utility. See 11 U.S.C. Sec. 366(a) ("[A] utility may not ... discontinue service ... solely on the basis that a debt owed by the debtor to such utility for service rendered before the order for relief ..."). Moreover, in Sec. 366(b), the public utility is granted protection and assurance of payment for services provided after the date of the bankruptcy petition. See 11 U.S.C. Sec. 366(b) ("[A] utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order of relief, furnishes adequate assurance of payment ..."). Therefore, the Bankruptcy Code recognizes not only public utilities' special status as monopolies, but also emphasizes their right to collect from their customers in bankruptcy.
 
 
 48
 Public utilities may also be distinguished from other creditors on the grounds that the utilities often do not maintain close working relationships with their debtors. Consequently, a public utility ordinarily does not have sufficient cause to believe its debtor is insolvent. Without advance knowledge of its debtor's adverse financial situation, it is unlikely that a public utility would intentionally request preferential transfers to circumvent the work of a bankruptcy trustee. See Morris, Bankruptcy Law Reform: Preferences, Secret Liens and Floating Liens, 54 Minn.L.Rev. 737, 761-68 (1970).
 
 
 49
 In addition, public utilities are unique creditors because their collection practices are mandated by governmental regulations. In the present case, the bankruptcy judge recognized that MichCon was required, by the Michigan Public Service Commission and its own policies, to negotiate a payment agreement with Industrial and to send out a shut-off notice in response to Industrial's failure to make a payment. Joint Appendix at 68-69 (citing In re Industrial Metal Fabricators, No. 86-0615-R, trial transcript at 37-38 (Bankr.E.D.Mich. Jan. 31, 1989)). Similarly, this court also should recognize Michcon's unique status as a public utility subject to governmental procedures.
 
 
 50
 I am of the view that if sufficient consideration had been given to industry practice among public utilities and to Michcon's unique status as a public utility, then the majority would have found clear error in the order of the district court affirming the bankruptcy court's award of $4,426.43 to Industrial's bankruptcy trustee as a recoverable preferential transfer. Industrial admittedly became delinquent on its utility payments during the preference period. MichCon, acting as a reasonable creditor, made a demand for the arrearses. Under the majority's theory, however, since MichCon took action customary to industry practice among public utilities[1] and protected itself from Industrial's non-payment, then the September 19 and October 16 payments received by Michcon must be deemed preferential transfers. Because Michcon's actions were customary in the public utility industry, dictated by governmental regulations, and "were made in the ordinary course of business ... of the debtor and the transferee," the majority has rendered the Sec. 547(c)(2)(B) exception meaningless. See 11 U.S.C. Sec. 547(c)(2)(B).
 
 
 51
 The majority concludes that Industrial did not make the September 19 and October 16 payments within the normal course of its business as required by Sec. 547(c)(2)(B). The majority suggests that MichCon failed to contact Industrial to arrange arrearses payments until Industrial's financial condition had deteriorated. Majority Opinion at 9. However, since Industrial had previously made payments, even if some payments were late, MichCon should not be faulted for its inaction before Industrial stopped making payments. Moreover, the majority suggests that Michcon's shut-off notice and settlement agreement with Industrial were not within the ordinary course of business between the parties. I disagree. This court has held that "[e]ven if the debtor's business transactions were irregular, they may still be considered 'ordinary' for purposes of Sec. 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." Fulghum, 872 F.2d at 743. In addition, it is well-settled that for a transfer to fall within the Sec. 547(c)(2) exception that it need not be common, but merely ordinary. See, e.g., In re Economy Milling Co., 37 Bankr. 914, 922 (D.S.C.1983) ("The transaction [between the debtor and the creditor] need not have been common; it need only be ordinary. A transaction can be ordinary and still occur only occasionally."). Although MichCon had not had previous negative interactions with Industrial, Michcon's shut-off notice and settlement agreement with Industrial were well within utility industry practice, dictated by governmental regulations and were "ordinary" within the meaning of Sec. 547(c)(2).
 
 
 52
 It is my view that the payment of $4,426.43 in question satisfied the standards for the Sec. 547(c)(2) exception to the preference section. Industrial's September 19 and October 16 payments to MichCon were made "within the ordinary course of business and pursuant to the ordinary business terms of the debtor and creditor." Fulghum, 872 F.2d at 745. Accordingly, I would reverse the order of the district court.
 
 
 
 [1]
 The actions which MichCon took--executing a payment agreement and sending a shut-off notice--were the only actions available to the public utility. Because a public utility is a monopoly and its services are essential to the continued existence of all businesses, the utility is regulated by state law. The termination of service by a utility would usually cause the immediate and irreparable demise of the enterprise. Other creditors have the ability to cease transacting business with the late paying customer or to try to recover deliveries from the customer with a past due account. Utilities, however, have no such options. Notice of termination and execution of workout agreements are the only remedial measures generally available to utilities. These actions are neither unusual in the utility industry, nor are they taken to place the utility at an unfair advantage with respect to other creditors. See In re Magic Circle, 64 Bankr. 269 (Bankr.W.D.Okla.1986)