In re WASHINGTON MANUFACTUR-
ING COMPANY, et al., Debtors.

Timothy F. FINLEY, Trustee, Plaintiff,

v.

MR. T'S APPAREL, INC., Defendant.

Bankruptcy Nos. 388–01467 to 388–01469.
Adv. No. 390–0109A.

United States Bankruptcy Court,
M.D. Tennessee,
Nashville Division.

July 31, 1992.

Joseph Kelly, Harwell, Martin & Stegall, P.C., Nashville, Tenn., for trustee.

Ramsey B. Leathers, Jr., Alagia, Day, Marshall, Mintmire & Chauvin, Nashville, Tenn., for defendant.

## MEMORANDUM OPINION ON TRUSTEE'S COMPLAINT TO RECOVER PREFERENCE

WILLIAM H. BROWN, Bankruptcy Judge.

The Trustee in these jointly administered chapter 11 cases filed this adversary proceeding against Mr. T's Apparel, Inc. ("Mr. T's") on March 17, 1990, alleging preferential transfers by the debtors to Mr. T's within the ninety days prior to the bankruptcy filing on March 1, 1988. The defendant's answer admitted that certain transfers were made within that period, but the answer relied upon the defenses provided by § 547(c)(2) and/or (4). This proceeding was tried on June 3, 1992, and the Court has reviewed the testimony, trial exhibits, argument, and briefs of the parties. The following contains findings of fact and conclusions of law pursuant to F.R.B.P. 7052. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### ISSUE

The issue to be decided is whether the transfers made by the debtors to the defendant within ninety days of the filing of bankruptcy are preferential, and if so, whether the defendant has proven one or more of the defenses relied upon under 11 U.S.C. § 547(c)(2) or (4). The Trustee has the burden of proof of all of the elements of a preference under § 547(b) and the defendant has the burden of proof of all of the elements of the § 547(c) defenses. 11 U.S.C. § 547(g).

The applicable bankruptcy code provisions are:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(b) and (c)(2), (4).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At the trial of this proceeding, certain elements of the requirements for a preference were admitted. The defendant admitted that all payments to Mr. T's within ninety days of the bankruptcy were payments to the defendant as a creditor or for its benefit; that the transfers within that ninety days were of the debtors' property; and that all payments made within the ninety days were for or on account of antecedent debts. Plaintiff's Trial Ex. 1. As to insolvency, the defendant did not contest insolvency; thus, the statutory presumption of insolvency within the ninety day reach back period prevails. 11 U.S.C. § 547(f). Therefore, only the last element of a preference, § 547(b)(5), required formal proof.

As to whether the transfers to Mr. T's during the ninety day reach back period enabled that creditor to receive more than it would have received in a chapter 7 liquidation, the substitute Trustee, Ronald R. Peterson, testified that he had analyzed the assets and liabilities of the debtors; that he had reviewed the claims against the estate, of which twenty-seven million dollars of unsecured claims, including the Pension Benefit Guaranty Board and trade creditors, appeared to be "good" claims; that only seven million dollars in assets, including pending avoidance proceedings, remained; and that unsecured creditors, such as Mr. T's, would receive only five to twenty cents on each dollar of allowed claims, depending upon the outcome of pending litigation. Mr. Peterson concluded that if this were a chapter 7 case, the unsecured creditors would not receive one hundred percent of their claims. The proof established, without real dispute, that § 547(b)(5) was satisfied and that the transfers to Mr. T's within the ninety day reach back period permitted Mr. T's to receive more than it

would have received in a chapter 7 liquidation.

From the admitted and proven facts the Court can therefore conclude that all of the elements of § 547(b) have been established and that the transfers made to Mr. T's within the ninety day period before bankruptcy were preferential transfers. The burden of proof thus shifts to the defendant to establish its § 547(c) defenses.

As to § 547(c)(2), the ordinary course of business exception, the Sixth Circuit has held that "[w]hether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination...." *In re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir.1989) (citing *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989)). Further, that Court stated: "In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." *In re Yurika Foods Corp.*, 888 F.2d at 45. Irregular payments "may be considered 'ordinary' for purposes of 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Id.* (quoting *In re Fulghum Const. Corp.*, 872 F.2d at 743).

Recently, the Sixth Circuit has addressed more fully the § 547(c)(2) defense. *In re Fred Hawes Organization, Inc.*, 957 F.2d 239 (6th Cir.1992). In that case, as in the present one, the sole witness for the defendant was its president who testified that it was "not the industry standard, nor [the defendant's] custom, to follow the literal terms of sale as set forth in an invoice or monthly billing statement." *Id.* at 242. The *Hawes* Court held that the defendant "must prove each of the three elements of § 547(c)(2) by a preponderance of the evidence." *Id.* In the present controversy, the parties stipulated at trial that the debts to Mr. T's were incurred by Washington Manufacturing Company in the ordinary course of its and of Mr. T's business; thus, the first prong of § 547(c)(2)(A) was met by stipulation.

The Sixth Circuit called § 547(c)(2)(B) "the subjective component," requiring "a fact-specific analysis." *Id.* at 244. Whether the preferential payments were made in the ordinary course of both the debtor and the transferee may involve an examination of many factors, including the lateness of a payment. "A late payment will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties." *Id.* (citations omitted). However, "[f]ailure to make a payment within the time limit set forth in the contract is presumptively 'nonordinary.'" *Id.* Obviously, one factor the bankruptcy court may examine is the conduct of the parties, in addition to the contractual terms. "[A] long history of dealing between parties could counteract the literal terms of a contract...." *Id.*

In pointing out that § 547(c)(2)(C) is a conjunctive element of the ordinary course defense, the *Hawes* Court held that "Congress intended that an ordinary payment be *both* ordinary between those particular parties *and* ordinary in the industry as a whole." *Id.* at 245. Section 547(c)(2)(C) is called the "objective" element of this defense. *Id.* This "objective" element requires proof that the "transaction in question comports with the standard conduct of business within the industry." *Id.* at 246. In *Hawes*, the "only testimony as to industry standards came from [the defendant's president] whose testimony in this regard the court found to lack credibility and reliability." *Id.* and n. 8. From *Hawes* it must be concluded that Mr. T's is required to prove not only that the payments were made in the ordinary course of these parties, but according to the ordinary terms within the industry as a whole.

The proof from the Trustee established that the debtors' records included the invoices from Mr. T's to Washington Manufacturing Company for services performed for the debtor and for shipping charges. Plaintiff's Trial Ex. 2. The debtors' records also included seven cancelled checks from Washington Manufacturing to Mr. T's, which checks were paid by the debtors' bank. Plaintiff's Trial Ex. 3. The payments within the ninety day period to-

talled $70,850.57. Mr. Peterson prepared a chart compiling the check payment dates and the Mr. T's invoices, which chart was a "fair and accurate summary" of records in the Trustee's custody and control. The chart did not include one invoice issued prior to the ninety day period because the Trustee was unable to "marry" that invoice with a check from the debtors.

The chart described the invoice terms and the number of days each invoice was outstanding before payment. There was also on the chart a credit column showing subsequent shipments or advances by the defendant. The chart revealed a net preference, after credit for subsequent advances, of $30,633.86. The chart demonstrated that each invoice was paid *after* the due date shown on the invoices. For example, some invoice terms were for payment "At once" and some were for payment "Net 10" days, while one was for payment in "Net 30" days. The "At once" invoices ranged in payment from nineteen to forty-three days. The "Net 10" invoices ranged in payment from twenty-two to thirty-three days. The "Net 30" invoice was paid in forty-six days. One invoice did not include a payment term and it was paid in forty days. Thus, out of sixteen invoices paid within the ninety days, there is variation in the payment terms on the invoices and there is no consistency of time of actual payment by the debtors. Plaintiff's Trial Ex. 4.

On cross examination of the Trustee, the defendant established that the Trustee's knowledge was limited to what the debtors' documents said, and the Trustee could not conclude if "Net 10" or "Net 30" terms were within the ordinary course of business of the debtor and other trade creditors. The time between the invoices and payment was getting longer within the ninety day preference period and was getting longer as the proximity to bankruptcy filing approached. The Trustee had no knowledge of unusual demand for payment by Mr. T's within the ninety days, and there was nothing in the Trustee's records indicating that Mr. T's had a concern about the debtors' creditworthiness within that time period. Further, there was no evidence that the checks for payment were held by Mr. T's, but there was some evidence in the debtors' records that the debtors held some checks to trade creditors just before the bankruptcy filing. The Trustee had no knowledge of why the terms varied on the Mr. T's invoices.

Based upon the records available to the Trustee, he admitted that invoice number 3922 and dated 12/31/87 was not paid by the debtor; thus, this amount of $2,255.15 was not shown on Exhibit 4 as a credit, but should be a credit against the net preference shown on that exhibit. Defendant's Trial Ex. B.

Mr. Edwin Eugene Tinsley, the president and sole shareholder of Mr. T's, testified that his company was a garment manufacturer, working on contract for fifteen to twenty customers. Mr. T's sells its labor, with the other party providing all material. This is what Mr. T's did for Washington Manufacturing. Mr. Tinsley has been in the apparel manufacturing business since August of 1966. He stated that there was nothing unusual about the beginning of his company's relationship with Washington Manufacturing. He further testified that his freight chargeback invoices were marked with terms "At once" because the shippers required immediate payment, and thus, he expected to be paid by Washington Manufacturing "as soon as possible." This was, he said, his company's ordinary course of business.

Mr. Tinsley further testified that on invoices for finished goods services, his company's ordinary course of business was to specify terms of "Net 10" to "Net 30" days. He did not know why the last invoice on Exhibit 4 was a "Net 30" day invoice but stated that his company had no records indicating that Washington Manufacturing requested a change in billing terms nor was the change an indication of Mr. T's effort to put pressure for payment on Washington Manufacturing. The Court notes that a change from "Net 10" to "Net 30" on the last invoice would not indicate an effort to put pressure on the debtor; rather, it would indicate the reverse. Mr. Tinsley stated that there were no unusual

collection efforts or demands by his company to Washington Manufacturing. Through March of 1988, Mr. Tinsley stated that he had no awareness of the debtors' financial problems.

Mr. Tinsley testified that his experience with Mr. T's in 1987 and 1988 supported a conclusion that it was not unusual for twenty to twenty-five percent of his customers to be fifteen to thirty days late in payment, nor was it unusual for Washington Manufacturing to pay its invoices late. The Court is not persuaded that proof of what is not an "unusual" characteristic is the equivalent of an ordinary course of business; that is, proof of what a minority of Mr. T's customers did is not proof of an ordinary course of business. It may in fact be proof of the nonordinary course of business. Every business has late paying customers, but the question for § 547(c)(2) purposes is whether there is a pattern of encouraging or allowing late payments that can be called an ordinary course of business.

Mr. Tinsley attempted to testify, based upon his experience with a contractors' group and upon his knowledge of what other similar contractors told him their billing experiences were, that the ordinary business terms in the industry would include invoice terms calling for payment in ten to thirty days from a finished goods invoice. As to freight invoices, the normal term would be payment upon receipt. As to late payments, it was not unusual to have late payments, with a spread of fifteen to twenty-five days late being within the usual expected range. The Court heard this testimony from Mr. Tinsley as to industry terms under an offer of proof after granting the Trustee's objection to Mr. Tinsley testifying as an expert witness on the industry standards. The Trustee's objection was based in part upon Mr. Tinsley not being revealed as an expert witness in the pretrial stage and in part upon Mr. Tinsley not being established to be an expert on the industry standards.

■ As in the *Hawes* opinion, there is an inherent problem with the defendant's president attempting to testify about the industry's ordinary business terms. Mr. Tinsley may be qualifiable as an expert on those terms but not in his own defense, because to so allow that testimony leads to the result in *Hawes*; that is, it is to be expected that the defendant's president would testify favorably to the defendant's position. *In re Hawes*, 957 F.2d at 246 n. 8. This Court is not saying that Mr. Tinsley was a witness lacking credibility, but Mr. Tinsley was not a disinterested witness. Further, his offered testimony of industry terms was inherently hearsay. As a result, his testimony lacks reliability, which is normally expected of independent expert witnesses. When the Court is faced with the reality that the defendant has the burden of proof on each element of the defense to a preference and when the only testimony supporting § 547(c)(2)(C) is self-serving testimony of the defendant's president, the Court can not say that the defendant has established the element of proof of the ordinary business terms of the industry in the defendant's favor. In light of the requirements of *Hawes*, defendants would be well served to have independent expert witnesses testify as to the ordinary business terms of the industry.

■ Moreover, there is an equally compelling problem with the defendant's proof in that the Court finds that the defendant failed to prove § 547(c)(2)(B) by a preponderance of the evidence. That is, as to the issue of whether the payments by the debtors to Mr. T's were made in the ordinary course of business of *both* the debtors and Mr. T's, the burden is on the defendant. The Trustee testified that there was evidence that Washington Manufacturing paid each of the invoices late, with varying degrees of lateness. The lack of consistency of payment dates in itself indicates a nonordinary course of business. Further, the Trustee testified that the lateness of payments was increasing as bankruptcy approached. There was no proof that the debtors and Mr. T's had a consistent history as to actual payment of the invoices from Mr. T's; rather, the proof demonstrated an inconsistency. The pattern within the ninety day reach back period

shows that the debtor paid the invoices at will rather than in compliance with any ordinary course of conduct. Assuming that late payments of the nature shown here were within the ordinary course of business of Mr. T's, the defendant failed to prove that an inconsistent pattern of late payments was the ordinary course of business of Washington Manufacturing. The defendant did not overcome the presumption that late payments were nonordinary. *In re Fred Hawes Organization, Inc.*, 957 F.2d at 244.

Considering all of the circumstances within the ninety days in question, the inconsistent timing of late payments does not establish anything but a nonordinary course of business for the debtor. Therefore, the Court concludes that the defendant failed to prove the elements of both § 547(c)(2)(B) and (C).

As to § 547(c)(4), the Trustee admitted that additional credit must be given against the preferential transfers for $2,255.15 in subsequent new value. Defendant's Trial Ex. B. This was the only proof of an additional new value exception to the preferential transfers, other than those credits already given by the Trustee on his Trial Exhibit 4.

### CONCLUSION

From the foregoing, the Court concludes that the Trustee is entitled to a judgment for net preferential transfers to the defendant in the amount of $28,378.71, this being the amount shown on the Trustee's Exhibit 4, less the additional $2,255.15 subsequent new value credit. The Trustee is also entitled to a judgment for court costs. Under all of the circumstances, including the fact that the *Hawes* opinion was issued shortly before this trial, the Court concludes that it is equitable to restrict the Trustee to interest from the date of judgment. A separate order and judgment will be entered.

SO ORDERED.