In re The **DECOR NOEL CORPORATION**, Debtor-in-Possession.

The **DECOR NOEL CORPORATION**, Plaintiff–Appellant,

v.

**YULETIDE KREATIONS, INC.,** Defendant–Appellee.

No. 86–2867–HA.

United States District Court, W.D. Tennessee, W.D.

May 31, 1991.

William A. Carson, II, Lucion T. Pera, Memphis, Tenn., for plaintiff-appellant.

Howard B. Hayden, Memphis, Tenn., for defendant-appellee.

## ORDER AFFIRMING THE DECISION OF THE BANKRUPTCY COURT

HORTON, Chief Judge.

The court must decide whether Decor Noel's payment made of $13,600.00 by

plaintiff to defendant Yuletide Kreations, Inc., was made in the ordinary course of business and not subject to § 547(b) avoidance.

After a *de novo* review of the record, transcripts, exhibits, briefs and the Bankruptcy Court's order, this court AFFIRMS the Bankruptcy Court's ruling that Decor Noel's $13,600.00 payment to Yuletide Kreations was made in the ordinary course of business and thus excepted from avoidance under 11 U.S.C. § 547(c)(2). (YUL. Tr., p. 19).

BACKGROUND

Plaintiff-appellant [debtor in possession], The Decor Noel Corporation, (hereinafter "Decor Noel" or "the debtor") a corporation which manufactures and sells Christmas decorations, filed a Chapter 11 petition on February 6, 1985.

On June 24, 1985, Decor Noel filed a Complaint to Avoid and Recover Preferential Transfers, asserting Decor Noel, while insolvent, paid on account of antecedent debt, the sum of $13,600.00, which Decor Noel asserts is proscribed by 11 U.S.C. § 547(b); and, after all due credits are given, Yuletide Kreations owed Decor Noel the amount of $13,600.00.

On September 27, 1985, defendant-appellee Yuletide Kreations, Inc., a company doing business in New York, answered, asserting Decor Noel's payment was made in the ordinary course of business.

On June 9, 1986, a trial on the merits was held before Bankruptcy Judge Leffler, who ruled the payment was a preferential transfer excepted from avoidance under the "ordinary course of business" exception. (YUL. Tr., p. 19). On October 17, 1986, an order of judgment was entered by the bankruptcy court in favor of Yuletide Kreations in the amount of $13,600.00.

On October 24, 1986, Decor Noel filed a notice of appeal of the Bankruptcy Court's ruling pursuant to 11 U.S.C. § 547(b).

That appeal presented one issue for review:

Whether the Bankruptcy Court erred in ruling Decor Noel's payment of $13,-600.00 to Yuletide Kreations, ninety (90) days before the filing of the bankruptcy petition, was in the ordinary course of business; and thus, excepted from avoidance as preferential transfers under 11 U.S.C. § 547(c)(2).

On December 4, 1986, Decor Noel, filed its brief averring the payment was not made in the ordinary course of business. On December 24, 1986, Yuletide Kreations filed its brief asserting the payment was made in the ordinary course of Decor Noel's business. Yuletide Kreations also asserted classification as an avoidable preference would violate the clear policy of § 547, and that the $13,600.00 payment was a contemporaneous exchange.

On January 8, 1987, Decor Noel filed its reply brief, asserting one issue; namely, whether the payment of $13,600.00 was tendered in the ordinary course of business. On February 27, 1987, a hearing was held on the ordinary course of business issue. There have been no other filings or hearings in this action.

FACTS

Decor Noel filed a voluntary petition in Chapter 11 bankruptcy, on February 6, 1985. (Alex.Tr. p. 17). Decor Noel's business required prompt servicing of its customers, prompt receipt of raw materials and prompt delivery of finished products.

Yuletide Kreations, a company that procures bulk shipments of Christmas related merchandise from overseas manufacturers, acts as an agent, supplying merchandise to distributors throughout the United States. Yuletide Kreations profits by charging commissions on each sale. (Yuletide (hereinafter "YUL") brief filed December 24, 1986, p. 2) (citations omitted).

Prior to filing, these parties had not done extensive business with each other. However, ninety (90) days before filing, Decor Noel paid Yuletide Kreations $13,600.00, which the Bankruptcy Court ruled was a payment in the ordinary course of business. Decor Noel, in essence, asserts the Bankruptcy Court erred in applying the § 547(c)(2) ordinary course of business exception.

Decor Noel also asserts that both the changes in the terms of what was available as collateral, and the fact that the bank agreed to grant an exception to the general lending agreement, were tantamount to Decor Noel not operating according to normal business terms. Hence, they are due the amount of $13,600.00.

Yuletide Kreations relied on their brief and produced no witnesses in the bankruptcy proceeding. According to their brief, on or about July 31, 1984, Decor Noel contacted Yuletide Kreations to procure twenty thousand (20,000) Christmas light sets for its Memphis plant. (YUL brief filed December 24, 1986, p. 2) (citations omitted). In response, Yuletide Kreations sent a letter of confirmation on August 1, 1984. Yuletide Kreations acquired, and paid for, the lights which were delivered to Decor Noel on October 11, 1984. (YUL Brief, p. 2–3). Shortly thereafter, Yuletide Kreations received payment, i.e., check number 877, dated October 19, 1984, in the amount of $13,600.00, which cleared November 14, 1984, (33 days after receipt of merchandise and 44 days after invoice date). (YUL brief, p. 3).

Decor Noel's chief financial officer and treasurer, Jack Harris, the primary witness questioned in the adversary proceeding, had direct supervisory authority over Decor Noel's affairs, including accounts payable, as well as the borrowing of all funds. Mr. Harris testified that Decor Noel received 100% of its working/operating capital from CitiCorp Industrial Credit, Inc. (hereinafter "CitiCorp") with all receivables, inventory and fixed assets pledged as collateral. (Alex.Tr. pp. 15–19, 25–26).

Every day Mr. Harris computed the amount Decor Noel needed to operate. He then figured, on what he referred to as the "summary worksheet", Decor Noel's daily banking position. The daily banking position referred to the amount Decor Noel could borrow from CitiCorp on a particular day. The amount was determined by calculating the credit amount available, that is, the Pre–Approved loan ceiling (Decor Noel had one of $11,400,000.00) minus the outstanding loan balance due to CitiCorp. Decor Noel received the money via CitiCorp's disbursement account, maintained at First Tennessee Bank in Memphis, Tennessee.

Mr. Harris testified the CitiCorp and Decor Noel agreement calculated "remaining debt" by adding the sum of eighty-five percent (85%) of the value of Decor Noel's receivables, less than 30 days past due, plus seventy-five percent (75%) of Decor Noel's inventory. This figure represented the maximum amount Decor Noel could borrow (not exceeding "the fixed loan ceiling" of $11,400,000.00). (Alex.Tr. p. 29, line 2–13).

Decor Noel's former comptroller also testified that Decor Noel's ordinary course of collecting accounts receivables was to:

1. "Seasonally" date of all invoices;
2. have the majority of their invoices due on December 10 of the year of sale (in the instant case, 1984);
3. have all shipments delivered on or about the first of December.

Mr. Harris testified he always tried to improve Decor Noel's operating situation, but bills were being paid some thirty (30) to forty (40) days after invoices were received. He next testified it was Decor Noel's policy, for about one year, to date checks " ... as if they were going to be mailed and paid concurrently." Later Mr. Harris would check Decor Noel's loan availability with CitiCorp. If there were funds available he would pay the employees first from the oldest checks. (Alex.Tr. p. 32, lines 1–12). Continuing, Mr. Harris testified Decor Noel, prior to October 18, 1984, usually borrowed as they wanted and paid bills as they saw fit ... according to availability.

Decor Noel repaid CitiCorp by depositing money directly into CitiCorp's "accounts receivable" account at First Tennessee Bank. Mr. Harris clearly stated Decor Noel had *no authority* or *control* over the account. (Alex.Tr. p. 33, lines 4–20) (emphasis added).

During September 1984, board chairman Mr. Kosberg's personal guarantee of $800,000.00 expired. In October of 1984, Decor Noel *sought* a new line of credit with CitiCorp guaranteed by new board president Mr. Kaplan in the amount of $500,000.00.

However, CitiCorp did not raise this troubled company's debt ceiling. Mr. Harris testified there was no semi-unlimited debt ceiling given to Decor Noel in response to the October guarantee. Decor Noel reacted by shifting disbursements, always paying payroll and payroll taxes.

However, on October 18, 1984, Decor Noel's financial position changed drastically when the value of assets exceeded the credit ceiling. Mr. Harris testified that Decor Noel had effectively Borrowed $309,000.00 above their debt ceiling, causing a negative remaining debt figure.

Mr. Harris testified two prerequisites were needed to keep Decor Noel "afloat" ... the completion of product manufacturing and the shipping of orders. In response, Decor Noel air freighted raw materials for the order of it's biggest customer, KMART. Decor Noel only paid those suppliers of necessary raw materials in order to fulfill the balance of the majority of its sales. (Alex.Tr. p. 35, lines 12–24), i.e., Yuletide Kreations' light sets in this cause. *See,* (Decor brief, p. 6, filed December 4, 1986).

Mr. Harris generally agreed with defense counsel Carson's statement that "prior to mid-October ... you weren't at that time in a situation where you had negative debt availability and your normal procedure, which was to try to pay the oldest bills first attained; and after mid-October you had to change it because of those problems with getting additional funds[.]" (Alex.Tr. p. 36, lines 2–13).

After mid-October Decor Noel would, on a daily basis, call CitiCorp and request daily money to operate with. During this period Decor Noel showed a $200,000.00 loss. Decor Noel also projected a one-half million dollar loss, as of September 1984.

Mr. Harris also testified that on November 5, 1984, the debt ceiling was increased to $12.4 million. On November 6, 1984, Decor Noel was given additional lending authority allowing the acquisition of $384,000.00 of availability. (Alex.Tr. p. 38). Mr. Harris admitted that on November 30, 1984, the remaining debt available was $1,099,000.00, (Alex.Tr. p. 41, line 14),

which implies that during November, the CitiCorp loan was paid below the amount of $11.4 million. It was also established that:

1. On October 17, 1984, the combined credit availability was $382,491.00;

2. Decor Noel's total debt amounted to $11,384,380.02;

3. Decor Noel's total debt ceiling was $11,400,000.00;

4. Theoretically, there was available for loan approximately $382,000.00;

5. Realistically, Decor's debt availability was $15,619.98;

6. On November 30, 1984, the remaining debt available was $1,099,000.00; and,

7. On said date the combined availability was a *negative* (−)$1,247,000.00. (Alex.Tr. pp. 40–44).

Mr. Harris also testified the CitiCorp loan agreement cited three loan factors; and of the three, two were mainly used ... availability versus loan ceiling. (Alex.Tr. p. 42, lines 18–21). Mr. Harris further testified, that on or about November 15, 1984, Decor Noel removed its inventory's value from the calculation of availability; and as a result, on November 19, 1984, they were $1,800,000.00 over the available line of credit. Not withstanding, CitiCorp continued to let Decor Noel borrow, even though there was a negative combined availability.

Mr. Harris' testimony established that Decor Noel paid CitiCorp as collections were made from accounts receivable. Mr. Harris testified that in December of 1984, Decor Noel paid debt by borrowing funds from CitiCorp; creditors were paid selectively because Decor Noel had exceeded their credit availability limit.

Finally, the parties have stipulated to all the elements of a preference, except the presence of an antecedent debt. (YUL Tr., p. 9). However, the court below found that all of the elements of a preference were satisfied. (Order entered October 17, 1986, p. 1). There have been no other filings in this cause.

APPLICABLE LAW AND CONCLUSIONS

District courts have jurisdiction over appeals from decisions of bankruptcy courts. However, the Supreme Court's plurality opinion in *Northern Pipeline Construction Company v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), expressed concern over the fact that:

> § 241(a) of the Bankruptcy Act of 1978 has impermissibly removed most, if no all, of "the essential attributes of the judicial power" from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of congress' power to create adjuncts to the Art. III courts. 458 U.S. at 88.

Shortly thereafter, 28 U.S.C. § 157(b)(2) was enacted. § 157(b)(2) classifies bankruptcy proceedings as core or non-core. Bankruptcy judges may only enter final orders in core proceedings. The instant cause is classified, under § 157(b)(2)(F), as a core proceeding; and accordingly, a bankruptcy judge may enter a final order. Section 158(a) provides the jurisdictional basis for a district court to hear appeals of final orders. In the instant cause, the ruling of Judge Leffler is reviewable as a final decision and thus, jurisdiction is proper.

There are two standards of review on appeals from bankruptcy court judgments, *de novo* and clearly erroneous. In the Sixth Circuit "[f]act findings of the bankruptcy court [in a core proceeding] are reviewed for clear error. But where the bankruptcy court's fact finding arises from a misunderstanding of the law is reviewed for plain error of law." *In re Fulghum Construction Corp.*, 872 F.2d 739, 742 (6th Cir.1989) (citations omitted) (quoting, *Morgan v. K.C. Machine & Tool Co.*, 816 F.2d 238, 244 (6th Cir.1987)). Decor Noel presented one issue for review:

> Whether the bankruptcy court erred in ruling Decor Noel's payment of $13,-600.00 to Yuletide Kreations, within 90 days before the filing of the bankruptcy petition, was in the ordinary course of

business; and thus, excepted from avoidance as a preferential transfer under 11 U.S.C. § 547(c)(2).

Subsection (c) of § 547 lists preferential payments that are not avoidable by the trustee; here Decor Noel. In particular, § 547(c)(2)(B) and (C) reads as follows:

> The trustee may not avoid under this section a transfer ... to the extent that such transfer was ... (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.

The highly respected treatise, *Collier on Bankruptcy* has written,

> [t]o fall within the "ordinary course" of business exception, a transferee must show that: (i) the underlying debt of which payment was made was "incurred in the ordinary course of business or financial affairs" of both parties; (ii) the transfer was made "in the ordinary course of business or financial affairs" of both parties; and (iii) the transfer was made according to ordinary business terms. 4 *Collier on Bankruptcy*, § 547.10, pp. 547–50 (L. King & K. Klee 15th ed. 1990).

*Collier* also states, courts testing the ordinariness of a transaction should generally focus on prior conduct of the parties, common industry practice and particularly, whether payment resulted from any unusual practice. 4 *Collier, supra,* at pp. 547–50. § 547.10 (citations omitted) (footnotes omitted).

The Sixth Circuit recently held, in *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989), that "... [a] court's inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration; and not to practices which generally prevailed in the industry of the parties." *Id.* at 743 (citations omitted). Courts must look to the record to see if there has been any unusual action by either debtor or creditor to collect or pay on the deal. *In re*

*Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986).

*Collier* also states, courts have denied the § 547(c)(2) ordinary course of business protection, to transfers commonly known as "Ponzi Schemes". 4 *Collier, supra,* at pp. 547–51, § 547.10 (footnote omitted). The instant record does not support the presence of a "Ponzi Scheme" which uses after acquired funds to pay off previous debt. Furthermore, courts have also given late payments ordinary course of business protection "when such payments were well-established between the parties." 4 *Collier, supra,* at pp. 547–51, § 547.10; *see also, Yurika Foods Corp. v. United Parcel Service,* 888 F.2d 42 (6th Cir.1989) (late payments fell within the ordinary course transfers based on evidence of late payment practice between the parties and the industry in general). 4 *Collier, supra,* at pp. 547–51, § 547.10, fn. 8.

Of particular importance is a Sixth Circuit case, *In re Finn,* 909 F.2d 903 (6th Cir.1990). In *Finn,* a woman went to her credit union and borrowed a debt consolidation loan with her brother as a co-signer. As fate would have it, she was laid off within one year of receiving the loan. Notwithstanding the layoff, she continued to make payments until she filed a petition for relief. The trustee in *Finn* sought the return of $1,300.00 based on the cosigner's contingent liability. *Id.* at 905. The *Finn* court held "... as a general rule ... a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer. This rule holds where the transaction would not be out of the ordinary for a person in the borrower's position." *Id.* at 908.

Applying *Finn,* this court can not find Decor Noel's acquisition of Christmas lights from a company like Yuletide Kreations out of the ordinary. Payment after receipt is an ordinary business transaction. (YUL Tr. pp. 8–12). The receipt of payment 33 days after delivery of the goods, or 47 days after invoicing, is not out of the ordinary course of either company's business based on the record submitted in this cause.

The preference period began on November 8, 1984, during this time $13,600.00 was paid to Yuletide Kreations. A recent Sixth Circuit case, *In re Belknap, Inc.,* 909 F.2d 879 (6th Cir.1990), requires a closer look at the aforementioned payment. In *Belknap,* the court held a transfer, under the 1978 Bankruptcy Act, requires delivery, which occurs upon actual receipt of a check. *Id.* at 883–884. Applying *Belknap,* the date of payment of check # 877 provides the basis for the inference that the date of payment by the drawee bank was the date of receipt. The court also notes that the court below ruled Decor Noel's payment was a preference payment. (YUL Tr., p. 19). Accordingly, this court finds, based on the record, and the stipulation of the parties, that check # 877 was a preferential transfer within the meaning of § 547(b).

The court also affirms the bankruptcy court ruling that the debt was incurred in the ordinary course of business. (YUL Tr. p. 6). Mr. Harris testified, in the MCS[1] proceeding, that after October 25, 1984, Decor Noel's payment lag time increased to between 43 and 61 days. (*See* MCS tr. p. 5, lines 5–9, 10–13). In still another proceeding reviewed by this court, it was found that Decor Noel paid defendant V. Alexander Company[2] in the following manner:

---

1. Defendant-appellee Manufacturers Consolidation Services, Inc., (hereinafter "MCS"), is a company that acts as a "shipper's agent", doing business in Memphis, Tennessee. They were the subject of a recent opinion issued by this court in Civil docket # 86–2947. They had *done* business with Decor Noel for twelve years.

2. Decor Noel filed a similar appeal, Civil docket # 86–2868, recently ruled on by this court. Prior to the filing of the petition, for at least seven years, Alexander delivered and imported those raw materials necessary to make Decor Noel's product line.

| (Days after Invoice (DAI) | | | | No. of Times Late (freq) | |
|---|---|---|---|---|---|
| DAI | freq | DAI | freq | DAI | freq |
| 15 days | — 2 times | 16 days | — 2 times | 18 days | — 3 times |
| 20 days | — 1 time | 21 days | — 1 time | 22 days | — 4 times |
| 24 days | — 2 times | 27 days | — 4 times | 28 days | — 7 times |
| 29 days | — 8 times | 30 days | — 2 times | 31 days | — 2 times |
| 32 days | — 1 time | 33 days | — 1 time | 34 days | — 2 times |
| 35 days | — 2 times | 36 days | — 2 times | 39 days | — 1 time |

(See Exhibit 1 filed with Alex.Tr.).

These two proceedings serve as a "marker" of the delays, frequency of delays and practices of Decor Noel in paying creditors *before* and *during* their peak season. (*See*, MCS tr. p. 5, lines 5–9, 10–13). The record submitted in this cause, especially when reviewed in conjunction with two very similar causes filed and recently ruled on by this court involving Decor Noel, as well as, Mr. Harris' testimony, is illustrative of Decor Noel's payment philosophy. The above payment patterns buttress this court's finding that this payment, by Decor Noel, was in the ordinary course of business.

Yuletide Kreations did not choose to send dunning letters, nor did they call. Yuletide Kreations accepted payment within its ordinary course of business. As the *Finn* court stated, when speaking of Ms. Finn's consolidation loan, "[t]he type of loan taken out by Finn ... is, indeed the life blood of credit unions ... and of commercial credit companies, and is an important part of the business of banks. Such a transaction can scarcely be "unusual" for every borrower." *In re Finn*, 909 F.2d 903, 908 (6th Cir. 1990).

Although we are not faced with a credit union, Yuletide Kreations provided a useful service to Decor Noel. It can hardly be said that Decor Noel's use of Yuletide Kreations to acquire of the light sets was unusual. *Finn* also held, a transaction can be afforded ordinary course protection *even if* it is the first transaction between the parties as long as it would not be out of the ordinary for the borrower. The instant transaction was *not* out of the ordinary.

The court also takes judicial notice of the seasonal nature of this business. Even the most joy filled Christmas shopper would have little use for these products beyond the holiday season. Accordingly, the court can fathom how Yuletide Kreations exercised good business judgment in assuming the payment was in the ordinary course of Decor Noel's business. Decor Noel's method of payment, between September and the end of 1984, was reasonable and according to its ordinary business terms. Just because the payment was late does not provide this court a sufficient basis to term it not in the ordinary course of Decor Noel's business.

The record submitted provided an adequate basis for ruling the payment was made in the ordinary course of business. Mr. Harris testified that Decor Noel, a highly seasonal business, was only trying to keep the "doors" of their business open, the flow of products moving, and people working. Decor Noel paid those who were necessary to maintain its business. The record provides adequate support for the ruling below. The bankruptcy court did not err.

As the Sixth Circuit held in *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989), business practices unique to Yuletide Kreations and Decor Noel, prior to the ninety (90) day preference period must be reviewed. These practices circumscribe the exclusion of the single payment made by Decor Noel from the avoidance powers granted in § 547(b).

There is no evidence in this record of unusual action by the parties to facilitate payment or collection of the debt. Decor Noel prior to, and after filing, operated on a day to day basis. During mid-October Decor Noel borrowed from CitiCorp according to a formula that existed prior to the preference period. There was no change in

the manner or method used by Decor Noel to complete it's business transactions.

Mr. Harris did testify that Decor Noel's financial position changed drastically. However, there was neither an increase in Decor Noel's debt ceiling, nor a change in the way Decor Noel acquired operating capital. (*See* Alex.Tr. pp. 29–35). Such a "change in financial condition" is not unusual for a company experiencing cash flow problems on one hand, and fighting bankruptcy's "slippery slope" with the other. Mr. Harris best articulated Decor Noel's state of affairs,

> [w]e were still manufacturing and we were running behind because one ... we were late getting light sets out of Taiwan, and our largest customer was the primary purchaser ... I had to make sure that I kept money used more appropriately for the payroll and the payroll taxes and to do these things, to keep merchandise coming in." (Alex.Tr., pp. 31–32, 33–36).

The court below was correct. The policy considerations of §§ 547(c)(1)(2) and (4), are all designed to encourage creditors to deal with failing business and protect ordinary business transactions. The "ordinary course of business" exception encourages and facilitates rehabilitation, by encouraging creditors to continue to do business with the troubled enterprises. There was no change in the pattern of payments by Decor Noel. The payment was consistent with other payments made by Decor Noel to other creditors whom they deemed necessary to keep the company afloat.

After a careful *de novo* review of the entire record of this appeal, this court AFFIRMS the decision of the Bankruptcy Court; and finds that the payment submitted by Decor Noel during the preference period was made in the ordinary course of business.

It is so ORDERED.