In re The **DECOR NOEL CORPORATION**, Debtor-in-Possession.

The **DECOR NOEL CORPORATION**, Plaintiff–Appellant,

v.

**MANUFACTURERS CONSOLIDATION SERVICES, INC.**, Defendant–Appellee.

No. 86–2947–HB.

United States District Court, W.D. Tennessee, W.D.

May 31, 1991.

William A. Carson, II, Lucian T. Pera, Memphis, Tenn., for plaintiff-appellant.

David Bloylock, Memphis, Tenn., for defendant-appellee.

## ORDER AFFIRMING THE DECISION OF THE BANKRUPTCY COURT

HORTON, Chief Judge.

The court must decide whether payments made by defendant Decor Noel Corporation, debtor in possession, to Manufacturers Consolidation Services, Incorporated were made in the ordinary course of Decor Noel's business.

After a *de novo* review of the record, transcripts, exhibits, briefs, and the Bankruptcy Court's order; this court AFFIRMS the Bankruptcy Court's ruling that all payments, were made in the "ordinary course of business" and financial affairs of Decor Noel. (MCS Tr., pg. 27).

BACKGROUND

Plaintiff-appellant, Decor Noel Corporation, also the debtor in possession, (hereinafter "Decor Noel" or "the debtor") engages in the manufacture and sale Christmas decorations and ornaments. (Alex. Tr., p. 17).

Defendant-appellee Manufacturers Consolidation Services, Inc. (hereinafter "MCS"), is a company that acts as a "shipper's agent", doing business in Memphis, Tennessee.

Decor Noel filed a Chapter 11 petition on February 6, 1985. On June 24, 1985, Decor Noel filed a Complaint to Avoid and Recover Preferential Transfers, averring Decor Noel, within the 90 day preference period, which began November 8, 1984, while insolvent, paid on account of antecedent debt, the sum of $18,862.00. Decor Noel asserts, after all due credits were given to MCS, MCS owed Decor Noel the amount of $18,862.00.

On July 15, 1985, MCS filed it's answer, asserting that:

1.  the payments made by Decor Noel were *not* subject to the 90 day preference rule;
2.  the complaint failed to state a claim;
3.  the payments were in the ordinary course of business, hence, not voidable under § 547(c)(2).

On June 9, 1986, Bankruptcy Judge Leffler ruled all payments at issue were excepted from avoidance under the "ordinary course of business" exception of 11 U.S.C. § 547(c)(2). (MCS Tr., pg. 27). On October 31, 1986, Judge Leffler entered judgement in favor of MCS in the amount of $18,862.00.

On November 6, 1986, Decor Noel Corporation appealed the Bankruptcy court's final judgement, pursuant to 11 U.S.C. § 547(b).

The appeal presented one issue for review, namely:

*Whether the bankruptcy court erred in ruling payments totaling $18,862.000, were in the ordinary course of business; and excepted from avoidance as preferential transfers.*

On November 14, 1986, MCS filed it's statement of the following additional issue:

*Did the bankruptcy court err by ruling proof of Decor Noel's transactions with CitiCorp, was relevant to a determination of whether the transfer was made in the ordinary course of business or financial affairs of Decor Noel.*

MCS specifically stated the purpose of the pleading was not to appeal the ruling below ... but to seek review of this additional issue. On December 30, 1986, Decor Noel, filed it's brief claiming the payments made were in the ordinary course of business. Decor Noel also acknowledged the parties had stipulated to the payments at issue being classed as preferences. (MCS Tr., pg. 5). On January 20, 1987 MCS filed it's brief asserting the credit dealings of Decor Noel and it's principal secured creditor, CitiCorp, was not relevant to the question of whether the payments were made in the ordinary course of business. (MCS Brief pg. 16).

On January 28, 1987, Decor Noel's reply brief was filed which averred the text, history, and the relevant legislative history of § 547(c)(2), suggest that neither action, nor pressure by creditors is necessary to place a transfer outside the § 547(c)(2) exception. (Reply brief, filed January 28, 1987). Decor Noel finally asserted the court must examine the course of dealing, as well as the financial affairs of the Decor Noel. (MCS Tr., pg. 13).

FACTS

Decor Noel filed a voluntary petition in Chapter 11 bankruptcy, on February 6, 1985. Decor Noel's business required prompt servicing of its customers, prompt receipt of raw materials and prompt delivery of finished products.

Prior to the filing of the petition, for at least twelve years, MCS delivered items manufactured by Decor Noel. MCS is a company that acts as a "shipper's agent". MCS brokers railroad cars used in the transport of various goods manufactured in the Memphis area profiting by combining loaded freight cars of different customers to reduce the total weight of the assembled set of cars, which enables its customers to save money. For example, Goodyear Tire & Rubber Company, one of their customers, will load cars with products heavier than those loaded by Decor Noel. The combination of the two companies' freight can be added together and shipped at a savings to both companies. (MCS Tr., pg. 18).

James Smith, vice-president of Administration and Operations for MCS, testified that Decor Noel had been a customer of MCS every since he became a part of the company, that is, twelve years, at the time of the filing of the bankruptcy petition. (MCS Tr., pg. 8). Mr. Smith, the MCS employee most familiar with the two companies course of dealing, also testified MCS and Decor Noel did most of their business from September to November. (MCS Tr., pg. 9, lines 13–19). When asked about Decor Noel's payment pattern, Mr. Smith stated MCS normally received payment 15 to 20 days after invoicing.

On the other hand, Mr. Smith testified that during the "heavy season" they would expect payment anywhere from 30, 40, 50, or even 60 days after invoicing ... But Decor Noel always paid the total amount of outstanding invoices prior to the first of the year. (MCS Tr., pg. 10). Mr. Smith testified this pattern of payment had existed in 1982, 1983, and 1984. (MCS Tr., pg. 12). He also testified that MCS realized Decor Noel paid invoices faster in the beginning of the year when they had money. (MCS Tr., pg. 12–13). Finally, he testified MCS never received a bounced check, or chose to call Decor Noel for payment; and MCS never sent demand letters to Decor Noel. (MCS Tr., pg. 13).

When asked about the course of dealing between the parties Mr. Smith testified:
1. Decor Noel loaded the railroad cars;
2. Decor Noel called IGA railroad, in turn the cars are released;
3. Decor Noel next called MCS requesting invoicing;
4. Two to three days later, MCS invoiced Decor Noel.
5. Railroad cars arrived at destination;
6. Decor Noel received payment;
7. MCS is paid out of Decor Noel's accounts receivables;

(MCS Tr., pg. 13–14, 18).

Decor Noel's chief financial officer and treasurer, Jack Harris, the primary witness questioned in the adversary proceeding, had direct supervisory authority over Decor Noel's financial affairs, including ac-

counts payable, as well as the borrowing of all funds. Mr. Harris testified that Decor Noel received 100% of its working/operating capital from CitiCorp Industrial Credit, Inc. (hereinafter "CitiCorp") with all receivables, inventory and fixed assets pledged as collateral. (Alex. Tr. pp. 15–19, 25–26).

Every day Mr. Harris computed the amount Decor Noel needed to operate. He then figures, on what he referred to as the "summary worksheet", Decor Noel's daily banking position. The daily banking position referred to the amount Decor Noel could borrow from CitiCorp on a particular day. The amount was determined by calculating the credit amount available from CitiCorp, that is, the pre-approved loan ceiling (Decor Noel had one of $11,400,000.00) compared to the outstanding loan balance due to CitiCorp. Decor Noel received the money via CitiCorp's disbursement account, maintained at First Tennessee Bank in Memphis, Tennessee.

Mr. Harris testified the CitiCorp and Decor Noel agreement calculated "remaining debt" by adding the sum of eighty-five percent (85%) of the value of Decor Noel's receivables, less than 30 days past due, plus seventy-five percent (75%) of Decor Noel's inventory. This figure represented the maximum amount Decor Noel could borrow (not exceeding "the fixed loan ceiling" of $11,400,000.00) on a given day. (Alex. Tr. p. 29, line 2–13).

Decor Noel's former comptroller also testified that Decor Noel's ordinary course of collecting accounts receivables was to:

1. "Seasonally" date all invoices;
2. majority of their invoices due on December 10 of the year of sale (in the instant case, 1984); and
3. have all shipments delivered on or about the first of December.

Mr. Harris testified he always tried to improve Decor Noel's operating situation, but bills were being paid some thirty (30) to forty (40) days after invoices were received. He next testified it was Decor Noel's policy, for about one year, to date checks "... as if they were going to be mailed and paid concurrently." Later Mr. Harris would check Decor Noel's loan availability with CitiCorp. If there were funds available he would pay the employees first from the oldest checks. (Alex. Tr. p. 32, lines 1–12). Continuing, Mr. Harris testified Decor Noel, prior to October 18, 1984, usually borrowed as they wanted and paid bills as they saw fit ... according to availability.

Decor Noel repaid CitiCorp by depositing money directly into CitiCorp's "accounts receivable" account at First Tennessee Bank. Mr. Harris clearly stated Decor Noel had *no authority* or *control* over the account. (Alex. Tr. p. 33, lines 4–20) (emphasis added).

During September 1984, board chairman Mr. Kosberg's personal guarantee of $800,-000.00 expired. In October of 1984, Decor Noel *sought* a new line of credit with CitiCorp guaranteed by new board president Mr. Kaplan in the amount of $500,000.00. However, CitiCorp did not raise this troubled company's debt ceiling. Mr. Harris testified there was no semi-unlimited debt ceiling given to Decor Noel in response to the October guarantee. Decor Noel reacted by shifting disbursements, always paying payroll and payroll taxes.

However, on October 18, 1984, Decor Noel's financial position changed drastically. On that day the value of assets exceeded the credit ceiling [Mr. Harris testified that Decor Noel's had effectively borrowed $309,000.00 above their debt ceiling, causing a negative remaining debt figure].

Mr. Harris testified two prerequisites were needed to keep Decor Noel "afloat" ... the completion of product manufacturing and the shipping of orders. In response, Decor Noel air freighted raw materials for KMART's order, their biggest customer. Decor Noel only paid those suppliers of necessary raw materials and wanted to fulfill the balance of the majority of its sales. (Alex. Tr. p. 35, lines 12–24).

Mr. Harris generally agreed with defense counsel Carson's statement that "prior to mid-October ... you weren't at that time in a situation where you had negative debt availability and your normal procedure, which was to try to pay the oldest bills first attained; and after mid-October

you had to change it because of those problems with getting additional funds[.]" (Alex. Tr. p. 36, lines 2–13).

After mid-October Decor Noel would call CitiCorp and request daily its operating expenses. In addition, Decor Noel showed a $200,000.00 loss. Further, Decor Noel projected a one-half million dollar loss for 1984. Mr. Harris also testified that on November 5, 1984, the debt ceiling was increased to $12.4 million.

On November 6, 1984, Decor Noel was given additional lending authority allowing the acquisition of $384,000.00 of availability. (Alex. Tr. p. 38). Mr. Harris admitted that on November 30, 1984, thé remaining debt available was $1,099,000.00, (Alex. Tr. p. 41, line 14), which implies that during November, the CitiCorp loan was paid below the amount of $11.4 million. It was also established that:

1. On October 17, 1984, the combined credit availability was $382,491.00;

2. Decor Noel's total debt amounted to $11,384,380.02;

3. Decor Noel's total debt ceiling was $11,400,000.00;

4. Theoretically, there was available for loan approximately $382,000.00;

5. Realistically, Decor's debt availability was $15,619.98;

6. On November 30, 1984, the remaining debt available was $1,099,000.00; and,

7. On said date the combined availability was a *negative* (−)$1,247,000.00. (Alex. Tr. pp. 40–44).

Mr. Harris also testified the CitiCorp loan agreement cited three loan factors; and of the three, two were mainly used ... availability versus loan ceiling. (Alex. Tr. p. 42, lines 18–21). Mr. Harris further asserted, that on or about November 15, 1984, Decor Noel removed its inventory's value from the calculation of availability; and as a result, on November 19, 1984, they were $1,800,000.00 over the available line of credit. Notwithstanding, CitiCorp continued to let Decor Noel borrow, even though there was a negative combined availability.

Mr. Harris' testimony established, Decor Noel paid CitiCorp as collections were made from accounts receivable. Mr. Harris testified that in December of 1984, Decor Noel paid, out of borrowed funds approved by CitiCorp, creditors selectively listed because Decor Noel had exceeded their credit availability limit.

A review of the entire record shows that during the 90 day preference period Decor Noel paid MCS a total of $18,862.00, which the Bankruptcy Court ruled were payments in the ordinary course of business. Decor Noel asserts the Bankruptcy Court erred in applying the § 547(c)(2) ordinary course of business exception, and they are due $18,862.00 in alleged avoidable preferential transfers.

MCS asserts the bankruptcy court erred by admitting evidence of Decor Noel's loan agreement with CitiCorp in the proceeding below. The parties have stipulated that all of the payments are preferences.

APPLICABLE LAW AND CONCLUSIONS

District courts have jurisdiction over appeals from decisions of bankruptcy courts. However, the Supreme court's plurality opinion in *Northern Pipeline Construction Company v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), expressed concern over the fact that

§ 241(a) of the Bankruptcy Act of 1978 has impermissibly removed most, if not all, of 'the essential attributes of the judicial power' from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as a exercise of congress' power to create adjuncts to the Art. III courts. 458 U.S. at 88, 102 S.Ct. at 2880.

Shortly thereafter, 28 U.S.C. § 157(b)(2) was enacted. The purpose of this section is to determine whether a proceeding is a core or a non-core proceeding. The instant cause is classified, under § 157(b)(2)(F), as a core proceeding; and accordingly, a bankruptcy judge may enter a final order.

§ 158(a) provides the jurisdictional basis for district court to hear the appeals of Bankruptcy Judge's final orders. In the

instant cause, Judge Leffler's ruling that all of the payments were made in the ordinary course of business, is reviewable as a final decision and thus, jurisdiction is proper.

There are two standards of review on appeals from bankruptcy court rulings, *de novo* and clearly erroneous. Core proceedings are reviewed in the Sixth Circuit as follows ... "[f]act findings of the bankruptcy court are reviewed for clear error. But where the bankruptcy court's fact finding arises from a misunderstanding of the law is reviewed for plain error of law." *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989) (citations omitted) (*quoting, Morgan v. K.C. Machine & Tool Co.*, 816 F.2d 238, 244 (6th Cir.1987)). Decor Noel presented the following issue for review:

*Whether the bankruptcy court erred in holding that certain payments totalling of $18,862.000, made by Decor Noel to Manufacturers Consolidation Services, Inc., within 90 days before the filing of bankruptcy, were in the ordinary course of business; and thus, were excepted from avoidance as preferential transfers under 11 U.S.C. § 547(c)(2).*

MCS filed a statement of additional issues advancing the following additional issue:

*Did the bankruptcy court err by ruling that proof of Decor Noel's transactions with CitiCorp, Decor Noel's principal secured creditor, was relevant to a determination of whether the transfer was made in the ordinary course of business or financial affairs of Decor Noel and MCS under 11 U.S.C. § 547(c)(2).*

The parties have stipulated to the elements of a preference, per § 157(b)(1), (2), (3), (4), and (5). (MCS Tr., pg. 5, line 14–16). Subsection c of § 547, lists preferential payments that are not avoidable. In particular, § 547(c)(2)(A), (B) and (C), the ordinary course of business exception, reads as follows:

The trustee may not avoid under this section a transfer ... to the extent that such transfer was ... (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business of financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.

The highly respected treatise, *Collier on Bankruptcy* has written,

[t]o fall within the "ordinary course" of business exception, a transferee must show that": (i) the underlying debt of which payment was made was "incurred in the ordinary course of business or financial affairs" of both parties; (ii) the transfer was made "in the ordinary course of business or financial affairs" of both parties: and, (iii) the transfer was made according to ordinary business terms." 4 *Collier on Bankruptcy*, § 547.10, pg. 547–50 (L. King & K. Klee 15th ed. 1990).

*Collier* also states courts testing the ordinariness of a transaction should generally focus on the prior conduct of the parties, the common industry practice and particularly, whether payment resulted from any unusual practice. 4 *Collier, supra,* at pg. 547–50 ¶ 547.10 (citations omitted) (footnotes omitted).

However, the Sixth Circuit recently held in *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989), that "... [a] courts inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration; and not to practices which generally prevailed in the industry of the parties." *Id.* at 743 (citations omitted). Courts must look to the record to see if there has been any "unusual" action by either debtor or creditor to collect or pay on the deal. *In re Colonial Discount Corp.*, 807 F.2d 594, 600 (7th Cir.1986).

*Collier* also states, that courts have denied § 547(c)(2), ordinary course of business protection, to transfers commonly known as "Ponzi Schemes". 4 *Collier, supra,* at pg. 547–51, ¶ 547.10 (footnote omitted). The instant record does not support the presence of a "Ponzi Scheme", that is, the use of after acquired funds to pay off

previous debt. Furthermore, courts have also given late payments ordinary course of business protection "when such payments were well-established between the parties." 4 *Collier, supra,* at pg. 547–51, ¶ 547.10; *see also, Yurika Foods Corp. v. United Parcels Service,* 888 F.2d 42 (6th Cir.1989) (late payments fell within the ordinary course transfers based on evidence of late payment practice between the parties and the industry in general). A recent Sixth Circuit case *In re Belknap, Inc.,* 909 F.2d 879 (6th Cir.1990), requires a closer look at the Decor Noel's payments to determine when a transfer occurred.

■ In *Belknap,* the court held, for the purposes of a transfer under the 1978 Bankruptcy Act, delivery occurs upon actual receipt of a check by the creditor. *Id.* at 883–884. Below is a list of checks tendered by Decor Noel:

| Check # | Invoice date | Date on Check | When paid | Amount |
|---------|--------------|---------------|-----------|--------|
| 655 | 09/13/84 | 09/28/84 | 11/13/84 | $6,580.00 |
| 726 | 09/24/84 | 10/05/84 | 11/20/84 | 1,948.00 |
| 782 | 10/01/84 10/02/84 | 10/12/84 | 11/20/84 | 4,935.00 |
| 847 | 09/28/84 | 10/19/84 | 11/27/84 | 1,809.00 |
| 1031 | 10/24/84 10/31/84 | 11/19/84 | 12/13/84 | 3,590.00 |

See, (MCS tr., exhibit 1, item # 6).

---

Applying *Belknap,* the date of payment of checks #'s 655, 726, 782, 847, and 1031, provide the basis for the inference that the date of payment by the drawee bank was the date of receipt. The court also finds support in the pleadings where the parties have stipulated to the elements of a preference, as required by § 547(b)(1), (2), (3), (4), and (5). (MCS tr., pg. 4–5).

Accordingly, after a *de novo* review of the record and the stipulation of the parties; this court finds checks #'s 655, 726, 782, 847, and 1031 are preferential transfers within the meaning of § 547(b). The court below did not err.

■ In the instant cause, the debt was incurred in the ordinary course, in fact, the parties had transacted business for "several years" with similar late payments being made and accepted. Mr. Harris' testified that Decor Noel's payment lag time increased to between 43 and 61 days after October 25, 1984. (*See* MCS tr., pg. 5, lines 5–9, 10–13). Mr. Smith also testified that this same payment pattern occurred in the years of 1982, 1983, and 1984. Mr. Harris and Mr. Smith's testimony illustrates a course of business followed by these two parties that was, for them, ordinary.

■ In addition, the court also takes judicial notice of the seasonal nature of Decor Noel's business. Even the most joy filled Christmas shopper would have little use for Decor Noel's products outside the holiday season. Accordingly, the court can fathom that MCS must have exercised good business judgment to accept the late payments and class them as an ordinary business transactions. Decor Noel's method of payment, between September and the end of 1984, was reasonable and according to Decor Noel and MCS's ordinary business terms. Just because these payments were late does not provide an adequate basis to term them not in the ordinary course of business.

The record submitted supports the findings of the Bankruptcy court. A *de novo* review of the record identifies the factual similarity of the time lag experienced by MCS in it's dealings with Decor Noel during the years of 1982, 1983, and 1984. The testimony of Mr. Smith and Mr. Harris, suggest that Decor Noel is a highly seasonal business, trying to keep the "doors"

open, people employed and products flowing. Decor Noel paid those necessary to maintain business.

MCS trusted Decor Noel. There were no demand letters issued and not one of the Decor Noel's checks bounced. MCS chose not to call ... they continued to deal with Decor Noel as they had for twelve years. The record provides support for the ruling of the court below, and the court did not err when they held that said payments were in the ordinary course of business.

As the Sixth Circuit held in *In re Fulghum Construction Corp.*, 872 F.2d 739 (6th Cir.1989), the business practices unique to MCS and Decor Noel, prior to the ninety (90) day preference period must be reviewed. Those practices circumscribe the exclusion of all payments made from Decor Noel's § 547(b) avoidance powers.

Mr. Smith testified that there was, what he termed, an understanding that Decor Noel would pay when it had the money. MCS consciously decided, as they had for twelve years, to trust Decor Noel. Prior to the preference period, payments were received for years after the shipments reached their destination. Mr. Smith testified that Decor had always paid their bills by the end of the year. This was their ordinary pattern, as it had been for twelve years.

The bankruptcy court was correct when it included all of the aforementioned preferential payments within the § 547(c)(2) ordinary course of business exception. There is no evidence in this record of any unusual action by the parties to collect or pay the debt. Decor Noel prior to, and after filing, operated on a day to day basis. During mid-October Decor Noel borrowed from CitiCorp according to a formula that had existed prior to the preference period. There was no change in the manner or method used by Decor to complete business transactions.

Mr. Harris did testify that Decor Noel's financial position changed drastically. However, there was neither an increase in Decor Noel's debt ceiling, nor a change way Decor Noel acquired operating capital. (*See* Alex. Tr. pg. 29–35). The change in financial condition, referred to by Decor's counsel, is not unusual for a company that is experiencing both cash flow problems on one hand, and fighting bankruptcy's "slippery slope" with the other. Mr. Harris best articulates Decor Noel's condition,

[w]e were still manufacturing and we were running behind because ... we were late getting light sets out of Taiwan, and our largest customer was the primary purchaser ... I had to make sure that I kept money used more appropriately for the payroll and the payroll taxes and to do these things, to keep merchandise coming in. (Alex. Tr. pg. 31–32, pg. 33–36).

The court below was correct. The policy considerations of §§ 547(c)(1), (2), and (4), the "ordinary course of business" exception, encourages and facilitates rehabilitation, by encouraging creditors to continue to do business with the troubled enterprises. There was no change in the pattern of payments by Decor Noel. The payments made were all made according to the payment patterns that had existed between the MCS and Decor for twelve years. These invoices were paid according to the ordinary course of business and financial affairs of the two companies. Accordingly, this court affirms the decision of the Bankruptcy court that the payments totaling $18,862.00, were made in the ordinary course of business and excepted from avoidance.

The court now turns to the statement of additional issues filed by MCS. In that pleading, MCS requests this court, in effect, to determine if the bankruptcy court erred by admitting evidence pertaining to Decor Noel's loan agreement with CitiCorp. MCS reserved their right to appeal during the trial below. (*See*, MCS tr., pg. 20–23). However, this issue will not be ruled on by this court. MCS has a victory and there is little to be gained by a ruling on this non dispositive issue. The point sought to be litigated is now moot! And accordingly, this court will not issue an advisory opinion.

After a careful review of the entire record in this appeal, this court AFFIRMS the decision of the Bankruptcy Court. The appeal is dismissed, which is so ORDERED.