In re TENNESSEE VALLEY
STEEL CORP., Debtor.

Michael H. FITZPATRICK,
Trustee, Plaintiff,

v.

CENTRAL COMMUNICATIONS
AND ELECTRONICS, INC.,
Defendant.

Bankruptcy No. 94–32813.
Adv. Proc. No. 96–3106.

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 23, 1996.

Jenkins & Jenkins, Attorneys, P.L.L.C., James C. Cone, Knoxville, TN, for Plaintiff.

Ambrose, Wilson, Grimm & Durand, Stephen K. Garrett, Knoxville, TN, for Defendant.

## *MEMORANDUM*

RICHARD S. STAIR, Jr., Chief Judge.

This adversary proceeding was commenced by the Chapter 11 Trustee, Michael H. Fitzpatrick, on May 2, 1996, by the filing of a Complaint seeking to avoid and recover nine allegedly preferential payments made by the Debtor to the Defendant, Central Communications and Electronics, Inc., totaling $9,406.18. The Trustee's action is grounded on 11 U.S.C.A. §§ 547(b) and 550(a)(1) (West 1993). The parties stipulate that the payments, all made by check within the ninety days preceding the filing of the Debtor's voluntary petition under Chapter 11 on November 11, 1994, were made on the dates each check was honored by the Debtor's bank as follows:

| | |
|---|---|
| August 22, 1994 | $ 1,917.11 |
| August 25, 1994 | 2,402.69 |
| August 29, 1994 | 3,879.68 |
| September 20, 1994 | 144.51 |
| September 22, 1994 | 189.99 |
| September 28, 1994 | 52.36 |
| October 7, 1994 | 303.37 |
| October 26, 1994 | 261.65 |
| November 2, 1994 | 254.82 |

See *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

Additionally, the Trustee seeks to recover prejudgment interest from July 12, 1995, the date the Debtor, while serving as debtor-in-possession, demanded repayment of the disputed transfers. The Defendant stipulates that the Trustee has met his burden of proof on all elements under § 547(b) but relies on the ordinary course of business defense under 11 U.S.C.A. § 547(c)(2) (West 1993) to defeat the Trustee's claim. Alternatively, if the court determines the Defendant is unable to avail itself of the § 547(c)(2) defense, the Defendant contends it is entitled to an offset against the preferential transfers pursuant to the "new value" exception of 11 U.S.C.A. § 547(c)(4) (West 1993). All issues were tried before the court on December 9, 1996. The parties premarked and prefiled fifty-three exhibits, all of which were introduced into evidence during the course of the trial. The Defendant has the burden of proof on all issues under § 547(c). 11 U.S.C.A. § 547(g) (West 1993).

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(F) (West 1993).

## I

The Debtor, Tennessee Valley Steel Corporation, operated what is known as a mini steel mill in Harriman, Tennessee, through which it manufactured steel rebar. The Defendant operates a Motorola Service Center and sells, installs, and services Motorola communications equipment. At all times material to this adversary proceeding, the Defendant sold and serviced equipment utilized by the Debtor to communicate between its maintenance, electrical, shipping and other departments. The Debtor and Defendant began their business relationship in September 1993, and that relationship continued until the Debtor's commencement of its bankruptcy case.

The Debtor and Defendant conducted their business strictly on a credit basis. A sale or service order attributable to the Debtor generated a work ticket containing a description of the equipment or service provided by the Defendant and its cost to the Debtor. Subsequent to delivery of the equipment or services, the Defendant would mail an invoice to the Debtor accompanied by a copy of the work ticket. Each invoice stated the payment terms at "net 10 days." One of the Defendant's owners, Sharon Curbow, who also serves as the Defendant's bookkeeper, testified that the ten-day payment term stated on each invoice is a computer-generated term; that the Defendant's customers, including the Debtor, were not expected to pay their accounts within ten days; and that, generally, a telephonic inquiry of the Debtor was not made unless an invoice was at least forty-five days past due. Ms. Curbow also testified that monthly statements were routinely forwarded the Defendant's customers, including the Debtor, who had balances due on the thirtieth day of each month. Finally, Ms. Curbow testified that copies of invoices and work tickets attributable to equipment and services provided the Debtor were always transmitted to the Debtor by mail; that the Debtor always paid by check; that the number of invoices paid by the Debtor by a single check varied; and that the Debtor transmitted its payment by mail. The parties' method of doing business did not vary during the preference and pre-preference periods.

During the nine months preceding the commencement of the preference period, the Debtor made payments to the Defendant on forty-three invoices ranging from fourteen to seventy days after the invoice date. The average time within which the Debtor paid these forty-three invoices was 35.67 days. During the ninety-day preference period, the Debtor made twenty payments ranging from nineteen days to eighty-six days from the invoice date. The average time of payment during the preference period was 43.10 days from the invoice date. There is no dispute that, as a matter of course, the Debtor's

payments were routinely made beyond the ten-day payment term stated on each invoice. In fact, during the course of their business dealings, the Debtor never made a payment to the Defendant within ten days.

## II

Bankruptcy Code § 547(c)(2) provides:

The trustee may not avoid under this section a transfer—

    . . . .

    (2) to the extent that such transfer was—

    (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

    (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

    (C) made according to ordinary business terms[.]

11 U.S.C.A. § 547(c)(2) (West 1993).

■ In the Sixth Circuit, a party asserting an ordinary course of business defense must prove each of the three elements of § 547(c)(2) by a preponderance of the evidence. *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 242–43 (6th Cir.1992).

Discussing the interplay between § 547(b) and § 547(c)(2), the Sixth Circuit recently observed:

The preference rule aims to ensure that creditors are treated equitably based on the theory that "[u]nless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable." *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993) (citations omitted). *See also* H.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6138 (Congress intended to discourage creditors "from racing to the courthouse to dismember the debtor during his slide into bankruptcy" and to further "the prime bankruptcy policy of equality of dis-

tribution among creditors"). However, "the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *Fiber–Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219–20 (3d Cir.1994) (citations omitted). *See also [Union Bank v.] Wolas*, 502 U.S. [151,] 160–61, 112 S.Ct. [527,] 532–33 [116 L.Ed.2d 514] [ (1991) ] (detailing the history of section 547 and recognizing the same competing policies under section 547(c)). Moreover, the legislative history for section 547(c)(2) states that its purpose "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.C.C.A.N. 5787, 5874.

*Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811, 815 (6th Cir.1996).

■ The Sixth Circuit has also held that "[w]hether a payment is made in the ordinary course of business and according to ordinary business terms is a factual determination." *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989) (citing *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 742 (6th Cir.1989)). The court in *Yurika Foods* further stated: "In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." *Yurika Foods*, 888 F.2d at 45. Irregular payments " 'may be considered "ordinary" for purposes of … 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties.' " *Id.* at 45 (omission in original) (quoting *Fulghum Constr. Corp.*, 872 F.2d at 743).

In the present case, the Trustee stipulated the § 547(c)(2)(C) "industry standard" element in favor of the Defendant thereby limiting the issues before the court to § 547(c)(2)(A) and (B). The Trustee contends that the § 547(c)(2)(A) component requires the Defendant to establish that the nine disputed transfers were in payment of debts incurred "in the ordinary course of business of both *this* debtor and *this* creditor." (Pl.'s Trial Br. at 10.) Specifically, the Trustee argues that the Defendant has not established that the disputed transfers were in payment of a debt incurred in a manner ordinary to the Debtor. Such a determination, argues the Trustee, requires the Defendant to focus on those debts ordinarily incurred by the Debtor in the general operation of its business without regard to the Defendant. In other words, if the Trustee's argument is carried to its extreme, the Defendant, to meet its burden of proof under § 547(c)(2)(A), must establish that the Debtor's obligations to the Defendant, a trade creditor, were incurred in a manner substantially identical to the manner in which the Debtor incurred its obligations to all other trade creditors. This court has previously resolved this issue against the Trustee in another adversary proceeding. *See Fitzpatrick v. Ploof Truck Lines, Inc. (In re Tenn. Valley Steel Corp.),* Case No. 94–32813, Adv. No. 96–3100, slip op. at 11–14 (Bankr.E.D.Tenn. Nov. 21, 1996). For purposes of the matter presently before it, the court is, however, required. to reiterate its analysis in the *Ploof Truck Lines* decision.

"[T]here is scant case law on the issue of whether or not a debt has been incurred in the ordinary course of business between the debtor and the transferee." *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.),* 182 B.R. 728, 735 (Bankr.W.D.Va. 1995). The language of subsection (A) does not make it clear whether a defendant must prove that the debt was incurred in the ordinary course of the debtor's business, taken alone, or the ordinary course of business between the debtor and the defendant. *Youthland, Inc. v. Sunshine Girls of Fla., Inc. (In re Youthland, Inc.),* 160 B.R. 311 (Bankr.S.D.Ohio 1993), adopted the former approach. This interpretation "requires an examination of the debts incurred for which the transfers were payment for the normality of such incurrences in *each* party's business operations generally." *Id.* at 314 (emphasis added).

The other approach to subsection (A) asks whether the debt incurred was ordinary *as between* the debtor and the defendant. *See DuVoisin v. Anderson (In re S. Indus. Banking Corp.),* 92 B.R. 297, 302 (Bankr. E.D.Tenn.1988) ("Section 547(c)(2)(A) requires that the *debt* be the kind routinely carried between the creditor and the debtor."); *see also In re Midway Airlines, Inc.,* 69 F.3d 792, 797–98 (7th Cir.1995) ("[T]he subjective requirements of 11 U.S.C. § 547(c)(2)(A)–(B) ... can be satisfied through proof of the parties' own dealings[.]"); *Mordy v. Chemcarb, Inc. (In re Food Catering & Housing, Inc.,)* 971 F.2d 396, 398 (9th Cir.1992) ("[A] creditor must prove that ... the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor[.]"); *Huennekens v. Marx (In re Springfield Contracting Corp.),* 154 B.R. 214, 222 (Bankr. E.D.Va.1993) ("Section 547(c)(2)(A) and (B) contemplate a subjective test: Was the debt and the transfer ordinary as between the debtor and the creditor?"); *Kroh Bros. Dev. Co. v. Aoki Landscape Maintenance (In re Kroh Bros. Dev. Co.),* 104 B.R. 182, 184 (Bankr.W.D.Mo.1989) ("[T]here is no evidence in the record that the debts underlying the invoices were incurred in the ordinary course of business between the parties as required by § 547(c)(2)(A)[.]"), *aff'd,* 114 B.R. 658 (W.D.Mo.1990), *rev'd in part on other grounds,* 930 F.2d 648 (8th Cir.1991).

The latter approach, in addition to its appearance as the majority view, seems to receive implicit support from the Sixth Circuit in *Fulghum Constr. Corp.* Discussing the § 547(c)(2) defense in general, the Sixth Circuit noted that "[e]ven if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings *between* the particular parties." *Fulghum Constr. Corp.,* 872 F.2d at 743 (emphasis added). The court went on to find the ordinary course of busi-

ness defense applicable where "[t]he advances and repayments were 'recurring' in nature as demonstrated by over 100 such transactions which were executed between [the parties in the fifteen months prior to the bankruptcy filing]." *Id.* at 744. This analysis suggests that § 547(c)(2)(A) looks to whether the debt was incurred in the ordinary course of business between the parties, as opposed to a determination of whether the debt was incurred in the ordinary course of each party's business, as viewed separate from their dealings with one another. As such, this court will apply the approach that looks to whether the debt was incurred in the ordinary course of business *between* the parties.

The court accordingly finds that the Defendant has met its burden of proof. The evidence establishes that, similar to the parties in *Fulghum,* the Debtor and the Defendant entered into a number of transactions within the nine months preceding the preference period. In all, forty-three separate obligations were incurred by the Debtor during this period. All of these obligations were incurred for the same purpose: the purchase or service of communications equipment sold by the Defendant to be utilized by the Debtor in the operation of its business. Similarly, the twenty obligations incurred by the Debtor for which it rendered payment during the preference period were incurred for the purchase or service of communications equipment sold by the Defendant to the Debtor for use by the Debtor in the operation of its business. Furthermore, the Defendant's communication consultant, Stephen Kwasnoski, testified that during the period of the parties' business dealings he was at the Debtor's Harriman facility at least twice a month; that when the Debtor had a communications need it would convey that need to him and he would put together a proposal; that the Defendant would respond to the Debtor's service and equipment requirements as the need arose; and that this procedure remained the same during the pre-preference and preference periods. Accordingly, the debt incurred by the Debtor during the preference period was the product of normal financial relations between the Debtor and Defendant as opposed to an " 'unusual

action' undertaken during the [Debtor's] 'slide into bankruptcy.'" *See Gosch v. Burns (In re Finn),* 909 F.2d 903, 907 (6th Cir.1990) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329). The court therefore finds that the twenty obligations incurred by the Debtor for which it rendered payment during the preference period were incurred in the ordinary course of business between the Debtor and the Defendant.

### III

Subsections (B) and (C) of § 547(c)(2) "comprise a subjective and objective component respectively." *Hawes,* 957 F.2d at 244. "The subjective prong (subsection (B)) requires proof that the debt and its payment are ordinary in relation to other business dealings between that creditor and that debtor. The objective prong (subsection (C)) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry." *Id.* at 244. *See Carled,* 91 F.3d at 813.

The Sixth Circuit, in *Hawes,* in discussing the "subjective component" of § 547(c)(2)(B), required a "fact-specific analysis." *Hawes,* 957 F.2d at 244. Whether the preferential payments were made in the ordinary course of business of both the Debtor and the transferee may involve an examination of many factors, including the lateness of the payment. The court stated that "[a] late payment will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties." *Id.* at 244. However, the court further stated that "[f]ailure to make a payment within the time limit set forth in the contract is presumptively 'nonordinary.'" *Id.* at 244. Obviously, one factor the court may examine is the conduct of the parties in addition to the contractual terms. The *Hawes* court stated that "a long history of dealing between the parties could counteract the literal terms of a contract." *Id.* at 244.

In the present case, the Trustee correctly contends that the payments made during the preference period "were not made according to the payment terms on the [De-

fendant's] invoices" because they were all made after the ten-day due date set forth in each invoice; that the payments made by the Debtor on the forty-three invoices within the nine-month pre-preference period were made on the average of 35.67 days from the date of the invoice; and that the Debtor's payment of the twenty invoices during the preference period increased to an average of approximately forty-three days from the date of the invoice. The court does not agree, however, that these factors, taken alone, defeat the Defendant's reliance on the § 547(c)(2)(B) component. What the court deems significant is that the Debtor, with a single exception, continued to scatter its preference period payments within the same time frame as it scattered its pre-preference period payments. Specifically, during the pre-preference period the Debtor paid twenty-one invoices within eleven to thirty days of the invoice date; seventeen invoices within thirty-one to sixty days of the invoice date; and five invoices over sixty days. Of the five invoices paid more than sixty days from the invoice date, one was paid in sixty-four days, one was paid in sixty-five days, and three were paid in seventy days. During the preference period, the Debtor paid four invoices within eleven to thirty days of the invoice date; fourteen invoices within thirty-one to sixty days of the invoice date; and two invoices more than sixty days from the invoice date. Of the two invoices paid more than sixty days from the invoice date, one was paid in sixty-five days and one was paid in eighty-six days. The fact that forty-three invoices were paid during the nine-month pre-preference period whereas twenty invoices were paid during the ninety-day preference period unfairly skews the average between the pre-preference and preference period payments. During both the pre-preference and preference periods, all of the Defendant's invoices were paid by the Debtor beyond the ten-day payment terms stated on each invoice. During the nine-month pre-preference period, payments made by the Debtor were consistently scattered between fourteen and seventy days from the date of the Defendant's invoices. Similarly, with one exception, payments made by the Debtor

during the preference period were consistently scattered between nineteen and sixty-eight days from the invoice date. As between the Debtor and Defendant, payments of up to seventy days from the date of invoice were normal and not an aberration. It appears to this court that for the purposes of § 547(c)(2)(B), once the parameters of that which is ordinary to the course of the business or financial affairs of the Debtor and Defendant during the pre-preference period have been established, the fact that the Debtor's preference period payments may fluctuate within these parameters is inconsequential so long as the payments continue to be scattered within these parameters. This is not to say that any preference period payments made within the parameters established by the pre-preference period payments are automatically deemed ordinary between the parties. The determinative factor is whether the preference period payments were scattered within these parameters. Such is the case with the preference period payments made by the Debtor. With the single exception of an invoice paid by the Debtor eighty-six days after its date, the Debtor and Defendant operated within the preference period in the same manner as they operated during the nine-month pre-preference period.

In the present case, late payments were the norm: payments during the nine-month pre-preference period were consistently made within fourteen to seventy days after the invoice date; and payments during the preference period, with the exception of the eighty-six day payment, were consistently made within nineteen to sixty-eight days of the invoice date. Actually, whereas the Debtor made five payments during the nine-month pre-preference period more than sixty days from the invoice date, it made only two payments in over sixty days during the preference period.

For the above reasons, the court finds that with the exception of the eighty-six day payment, all payments during the preference period to the Defendant from the Debtor were "made in the ordinary course of busi-

ness or financial affairs of the Debtor and the [Defendant]." The eighty-six day payment of the Defendant's invoice, No. 58953, dated August 3, 1994, in the amount of $254.82, was not "made in the ordinary course of business or financial affairs of the Debtor and the [Defendant]." The Defendant has accordingly met its burden of proof under § 547(c)(2) with regard to all but the $254.82 transfer made on November 2, 1994.

## IV

■ As an alternative to its ordinary course of business defense under § 547(c)(2), the Defendant asserts its entitlement to rely on the "new value" exception under § 547(c)(4). The court, having determined that all payments made to the Defendant by the Debtor within the preference period, with the exception of the eighty-six day payment, are subject to the ordinary course of business defense and may not, therefore, be avoided by the Trustee, need address only the $254.82 payment made to the Defendant. That payment, although honored by the Debtor's bank on November 2, 1994, was made for purposes of the Defendant's § 547(c) defenses, on the date the check was delivered to the Defendant, October 28, 1994.[1]

Code § 547(c)(4) provides:

The trustee may not avoid under this section a transfer—

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise un-

avoidable transfer to or for the benefit of such creditor[.]

11 U.S.C.A. § 547(c)(4) (West 1993).

Section 547(c)(4) thus creates an exception to the general rule that preferential transfers may be recovered for those situations in which a creditor provides new value after the preferential transfer is made but before the filing of the Debtor's bankruptcy petition. The statute defines new value as "money or money's worth in goods, services, or new credit. . . ." 11 U.S.C.A. § 547(a)(2) (West 1993). However, the giving of new value alone is insufficient for an application of the exception. The Debtor must not have paid for the new value by making "an otherwise unavoidable transfer to or for the benefit of such creditor" on account of the new value. § 547(c)(4)(B). Furthermore, the new value cannot be secured by "an otherwise unavoidable security interest." § 547(c)(4)(A).

■ The purpose of § 547(c)(4) is "to encourage creditors to deal with troubled businesses in the hope of rehabilitation." *Kroh Bros.*, 930 F.2d at 651. As observed by the 11th Circuit, "[a] subsequent advance is excepted because . . . a creditor who contributes new value in return for payments from the incipient bankrupt . . . should not later be deemed to have depleted the bankruptcy estate to the disadvantage of other creditors." *Charisma Inv. Co. v. Airport Sys., Inc. (In re Jet Fla. Sys., Inc.)*, 841 F.2d 1082, 1083 (11th Cir.1988) (per curiam). "Thus, the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate." *Kroh Bros.*, 930 F.2d at 652. The new value exception does not apply unless the creditor extended new value to the debtor subsequent to a preferential payment. *Waldschmidt v. Rainier (In re Fulghum Constr. Corp.)*, 706 F.2d 171, 173 (6th Cir. 1983), *cert. denied*, 464 U.S. 935, 104 S.Ct. 342, 343, 78 L.Ed.2d 310 (1983). Accordingly, the exception is more properly termed the

---

1. While the date each disputed check was honored by the Debtor's bank is material to a resolution of the § 547(b) issue, only the date the Debtor delivered the checks to the Defendant is relevant to the § 547(c) discussion. *See Barnhill*, 503 U.S. at 401, 112 S.Ct. at 1391 (noting the

different purposes of § 547(c) and § 547(b) and that the Courts of Appeal that have considered the § 547(c) issue have held that under § 547(c) a transfer is determined based on the "date of delivery" rule).

"subsequent advance rule." *Id.* Yet, new value advanced subsequent to the filing of the debtor's petition is not applicable to the § 547(c)(4) defense. *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1284–85 (8th Cir.1988).

In this proceeding, the record establishes that the Defendant made a total of eight advances of equipment and services between October 28, 1994, and November 11, 1994. The equipment and services constitute "new value" as defined by § 547(a)(2). Specifically, the eight subsequent advances represent $688.02 worth of new value. This new value was not "secured by an otherwise unavoidable security interest." § 547(c)(4)(A). Therefore, the court need only determine if the Debtor made "an otherwise unavoidable transfer to" the Defendant "on account of" this new value. § 547(c)(4)(B).

In *Fitzpatrick v. Rockwood Water, Wastewater and Natural Gas Sys. (In re Tenn. Valley Steel Corp.)*, 201 B.R. 927 (Bankr. E.D.Tenn.1996), this court set forth the following six-step approach to determine the applicability of § 547(c)(4).

(1) "With respect to each, individual transfer of new value, the [court] must determine whether there has been an 'otherwise unavoidable transfer' on account of the new value."

(2) "If the new value was paid for by the debtor with a payment not alleged to be a preference ... the creditor may not avail itself of that increment of new value."

(3) If any of the payments made by the debtor subsequent to the advancement of new value are alleged to be preferences, the court must:

(a) "[D]etermine whether or not any of the ... alleged preferences are payments on account of the new value."

(b) "If they are, with respect to those payments, the creditor must determine whether or not it has grounds to allege that the preference is defensible under one of the statutory preference defenses in 11 U.S.C. § 547(c) other than 11 U.S.C. § 547(c)(4)."

(c) "If so, and if the creditor prevails on that defense, the new value on account of which that 'otherwise unavoidable transfer' was made cannot be utilized by the creditor as a preference defense."

*Id.* at 940–41 (quoting *Pay 'N Pak Stores, Inc. v. Slide–Co. (In re PNP Holdings Corp.)*, 167 B.R. 619, 628–29 (Bankr. W.D.Wash.1994)). Because the Trustee alleges that all of the payments made by the Debtor to the Defendant are preferences, the court begins its analysis with step three. The court must first determine whether any of the alleged preferential payments were made on account of the new value extended by the Defendant. The following table summarizes the new value extended to the Debtor by the Defendant subsequent to October 28, 1994:

| Date New Value[2] Delivered to Debtor | Amount of New Value | Invoice Number For New Value Delivered |
| --- | --- | --- |
| 10/31/94 | $152.90 | 60989 |
| 10/31/94 | 102.99 | 60976 |
| 11/2/94 | 29.09 | 61048 |
| 11/2/94 | 48.17 | 61049 |
| 11/2/94 | 112.04 | 61051 |
| 11/3/94 | 150.98 | 61045 |
| 11/7/94 | 67.49 | 61128 |
| 11/7/94 | 24.36 | 61130 |

The following table summarizes the invoices on account of which the alleged preferential payments were made:

---

**2.** The dates in this column represent the dates the equipment and services comprising the new value were shipped by United Parcel Service to the Debtor. The work tickets accompanying each invoice do not establish the actual dates of delivery to the Debtor. The Defendant's General Manager for Operations and its Secretary and Treasurer, John T. Curbow, testified that United Parcel Service's usual delivery turnaround time was two days and that none of the equipment and services shipped to the Debtor were returned. Based on the record before it, the court finds that the equipment and services comprising the new value were delivered to the Debtor no more than two days after shipment. For purposes of convenience, the court accepts the date of shipment as the date of delivery. The result is

| Date Payment Delivered [3] | Amount of Payment | In Payment of Invoice(s) Number |
|---|---|---|
| 8/3/94 | $1,917.11 | 58356 |
| 8/15/94 | $2,402.69 | 57831 |
| | | 58807 |
| | | 58849 |
| | | 58844 |
| 8/22/94 | $3,879.68 | 58398 |
| 9/12/94 | $ 189.99 | 58712 |
| | | 58721 |
| | | 58709 |
| | | 58708 |
| | | 58722 |
| 9/13/94 | $ 144.51 | 59048 |
| | | 59075 |
| 9/22/94 | $ 52.36 | 59376 |
| 9/30/94 | $ 303.37 | 58806 |
| | | 59076 |
| 10/20/94 | $ 261.65 | 59626 |
| | | 59768 |
| | | 59839 |
| 10/28/94 | $ 254.82 | 58953 |

The record is clear that none of the transfers made by the Debtor to the Defendant, whether avoidable or not, were on account of the new value conveyed to the Debtor subsequent to October 28, 1994. None of the preference period transfers were made on account of invoices number 60989, 60976, 61048, 61049, 61051, 61045, 61128, or 61130. Because these were the invoices that billed for the new value delivered, it is clear that the Debtor did not make a transfer on account of this new value. All of the transfers made by the Debtor during the preference period were on account of value extended by the Defendant prior to October 28, 1994.

Given that the Defendant extended $688.02 worth of new value to the Debtor "on account of which new value the debtor did not make an otherwise unavoidable transfer to" the Defendant, the court finds that the Defendant has replenished the estate with new value in excess of the amount by which it depleted the estate through the October 28, 1994 transfer. Under § 547(c)(4), this new value serves as a complete defense to the Trustee's attempt to avoid this transfer. Accordingly, the court holds that the Trustee will not be permitted to avoid the October 28, 1994 transfer of $254.82.

For the reasons stated above, the Trustee is not entitled to a judgment avoiding and recovering any of the nine payments which are the subject of this adversary proceeding.

the same whether the date of delivery occurred one, two, or even three days after shipment.

The Trustee's Complaint will accordingly be dismissed.

A judgment consistent with this Memorandum will be entered.